PEEBLES *vs.* CASE.

*In the matter of proving the last will and testament of* FRANCIS GRAHAM, *deceased.*

*Two* wills bearing the *same* date, purporting to be attested by the *same* witnesses, and *both* in the handwriting of the decedent—one recognised and proved by both witnesses, who denied any knowledge of the other—the latter was admitted to probate as the *last* will, notwithstanding the denial of the witnesses, upon evidence of handwriting, identification of the instrument as recognised by the decedent, *memoranda* in the handwriting of the deceased, and other circumstantial evidence.

If the subscribing witnesses have lost all recollection of the execution, the Court, if satisfied from other evidence that they did in fact witness the will, may admit it to probate; the performance of the usual formalities being inferred from the recitals of the *testatum* clause.

When the subscribing witnesses corruptly deny the execution, and, *à fortiori,* when they are mistaken, the proof of the will may be supplied from other sources.

The proof of a will abides by the same rules of evidence as prevail in all other judicial investigations.

The question for the Court is, the *factum* of the instrument, and that may be proved in the very teeth of the subscribing witnesses.

As to the effect, nature and character of their testimony, the subscribing witnesses stand on the same ground as other witnesses, on the subject of contradiction; and if untruth, mistake, or want of recollection be alleged, it is not only competent to prove it, but, on its being proven, and the Judge being satisfied of the validity of the will, decree of probate should follow.

The sections of the statute providing that, where the witnesses are dead, insane, out of the State, or incompetent to testify, proof of their signatures may be taken, are only directory, and do not forbid a resort to that class of testimony in other cases, when necessary for the ascertainment of truth.

Having attained jurisdiction of the subject matter, the Surrogate, where the course of procedure is not prescribed by statute, must dispose of it according to the established rules of evidence.

ALDEN J. SPOONER *and* C. G. PEEBLES, *Executors in person.*
JAS. G. M'ADAM, *for Contestants.*

THE SURROGATE. The instrument propounded for probate in this case, by the executor, C. Glen Peebles, bears date February 15th, 1850, and purports to be attested by William B. Parsons, and David F. Smith. On the examination of these witnesses, George F. Case produced another will of the same date, which the witnesses identified as having been attested by them, at the same time denying any knowledge of the execution of the first-mentioned will. It is important to examine, with critical attention, the character of this denial, in order to see whether it is founded upon a clear and distinct recollection of the circumstances, or is the result of an argument in the minds of the witnesses. If the latter, then they may be mistaken in a conclusion derived from insufficient and erroneous reasoning. Mr. Parsons says, in relation to the execution of the will propounded by Mr. Peebles, " The signature of my name, as a subscribing witness thereto, *looks very much like my writing. I cannot say that it is. I would not like to say it is not, and I cannot say that it is mine.*" "I have not the slightest recollection of signing it." The witness then proceeds to state that he did attest a will of the deceased; the paper produced by Mr. Case,—and he gives his reasons for fixing upon that instrument. He says, 1. That at the time of execution, he noticed the words " Sparhawk Parsons," " eighth," on the last line of the first page of the will. 2. When Smith signed his name " David F.," he asked him why he signed so, he being called " Fred ; " to which the other replied that was his name, " David Frederick Smith." 3. That when the testator showed his signature, he recollects observing a peculiar scratch in the flourish under his name. Mr. Parsons adds, "I have no recollection of signing any other paper than Exhibit No. 1. ( the will produced by Mr Case) as a will, for him, at any other time. It is possible I may have signed other papers for Mr. Graham, but I have no recollection of signing any that he presented to me on that day, or at any other time, as a will, except Exhibit No. 1. I am quite sure he did

not exhibit his signature to me, to a paper which he called his last will and testament, at any time, except Exhibit No. 1. I have no recollection of signing any other papers than Exhibit No. 1, at any time, but it is possible I may have done so; but, if I did, I did not know what they were, at the time. Looking at my signature to the will propounded (by Mr Peebles) alone, *I don't see any reason to doubt its genuineness.* It is very possible it may be my signature, and that I have forgotten the occasion of putting it there, though I am quite sure it was not presented to me by Mr. Graham as his last will and testament." And again, "I cannot answer distinctly whether the signature of my name to said will was or was not written by me. I think I am acquainted with my own handwriting. From my knowledge of my own handwriting, I say, as I said before, it is very like my handwriting and possibly may be mine, but, not having any recollection of signing that paper, I cannot say that it is mine. I have no recollection of ever signing but one paper for Dr. Graham, but I may have signed a dozen. I can generally recognise my handwriting, independent of its association with any particular paper. I think I can. The only difference between the signatures to the two wills, that I observe, is that the signature to the will offered for proof (by Mr Peebles) seems stiffer than the other. The general character of the two signatures is not precisely the same; but if I did not write the signature to the will offered for probate (by Mr. Peebles), it is a very good imitation." "I don't think there was more than one paper signed when Exhibit No. 1 was signed, and I am sure there was but one paper signed as a will, in my presence, by Mr. Graham at any time."

Mr. Smith, the other witness, says "The signature of my name, to the paper propounded for proof in this matter by Mr. Peebles, *is not my signature,—is not my handwriting.*" "I never saw but two wills in my life, and these are the two. I recollect, distinctly, signing Exhibit No. 1. The reason why I know I signed Exhibit No. 1 is, because

it is *the way I always write my name ;* and Mr. Parsons, at the time I signed No. 1, as a witness, directed my attention to his father's name, 'Sparhawk Parsons,' 'one eighth' on the last line of the first page, which was turned down. "I never signed any other paper as a witness for Mr. Graham. I never sign my name as D. Frederick Smith. I never have done so that I recollect. If I have, it was years ago,—so long ago, that I could not recollect. I am positive I never witnessed but one instrument for Dr. Graham. I am positive the words 'Sparhawk Parsons,' 'one eighth' were on the last line of the first page of the paper I signed." On being recalled, he further testified : "*I don't think anything was said as to putting our place of residence.*" "I think I have written to Dr. Graham." "I should say I signed my name to those letters, David F. Smith, or D. F. Smith. Perhaps it might have been Fred. The letter shown to me is mine." It "is signed Frederick Smith. That is not my usual way of signing. I have frequently signed bills and receipts for Mr. Dunlap. I don't recall putting the D. when I put Frederick in my signature. My mode of signing has been various, but when it is out of my usual way I recollect it." "The signature to the will propounded, is not mine. I did not write the words added to the signature, 'Exchange Hotel, 133, Fulton St., New York.' I positively did not write it. I never signed my name in that way in my life. If I had done so once, I would have known it. *The writing has a resemblance to mine, is a good imitation, but it is not mine.* They are something like. There is a difference, almost in every letter, that I can see ; but I don't think that I can explain it. There is as much difference between the writing in the several exhibits, Nos. 2, 3, 4, 5, 6, and 7, as between the signatures to the will propounded and Exhibit No. 1 ; but, in each case, I can identify my handwriting, except in the signature to the will propounded for proof. I should say the signature to the latter is not so stiff as that to Exhibit No. 1. I think the general characteristics in both are the same."

"The body of both instruments, the will propounded, and Exhibit No. 1, including the attestation clause, are in Mr. Graham's writing; but I don't think both signatures are. I should not say the signature to the will offered for proof was his. I should think 'F. Graham,' on the paper now shown me (No. 8), is in his writing. I should think the whole paper is his. I should not say No. 9 was his. I should say No. 10 was his, and also Nos. 11 and 12. I don't know that I ever saw Mr. Peebles write. I should think that the words Francis Graham, in the paper now shown me, marked No. 13, looked like Mr. Graham's signature." Finally, the witness, having been called a third time, was asked whether he wrote the signature of his name to the will offered for proof by Mr. Peebles, and he answered: "*No, I did not; I never wrote my name in that way.*"

If these witnesses disprove the execution of the will propounded by Mr. Peebles, it is a forgery, and one, too, of a most remarkable character—a forgery of the names of witnesses to an instrument in every other respect confessedly genuine. For there is no manner of doubt that the entire body of both the wills in question, together with the attestation clause and the testator's signature, are in the writing of the deceased Francis Graham. To suppose that the testator put the names of Parsons and Smith there, is to suppose a wrong and motiveless act, by a party interested in having a genuine instrument. The paper bears marks of having been written after exhibit No. 1, and if Graham attempted to imitate the signatures of the witnesses to the first paper, he would not have varied the signature of Smith from "David F." to "D. Frederick." If we pass to the other supposition, that the signatures of the witnesses' names were written by some other person than Graham, then the fact urged by Smith, that he never wrote his name in that way, is strongly against the idea that any one would forge his name in that way. And, besides all, on the hypothesis of a forgery, there is the extraordinary

coincidence, that the names selected for that purpose are those of the two persons who witnessed the other will. To attempt the establishment of a will by counterfeiting the names of witnesses who are living, without attempting to secure their complicity, is certainly a singular mode of committing a great crime.

It is clearly proved that, about the 15th of February, 1850, the decedent executed his last will and testament, and yet two wills are produced, each bearing that same date, appointing the same executors, each written by the decedent, and each purporting to be subscribed by the same witnesses. It is certain that a will was executed. If there was only one will executed, which is the paper ; or does not the solution of the whole difficulty consist in there having been two wills executed on the same day ? May not both wills be genuine ? The instrument propounded by Mr. Peebles is more ample in form than the other, and, without doubt, was written after it.— In exhibit No. 1, the testator says, " I give, &c., unto the counsel whom I have this day retained and employed (by my sincere friend, C. Glen Peebles, Esq.), &c. &c." The will offered for proof by Mr. Peebles, runs thus, " I give, &c., unto Alden J. Spooner, Esq., of the city of Brooklyn, an attorney and counsellor whom I have this day retained and employed as my counsel (through my friend C. Glen Peebles, Esq., of the city of New York), &c., &c." Besides being less full and formal, in several of its details, than the will produced by Peebles, the will exhibit No. 1, contains an alteration of the interest originally bequeathed to Sparhawk Parsons, from " one-eighth " to " one quarter part." By each of these instruments, one-eighth of the estate is given to his counsel, and the remaining seven-eighths are distributed in eighth parts. Supposing the alteration from " one-eighth " to " one quarter " bequeathed to Sparhawk Parsons, by exhibit No. 1, to have existed at the time of execution, then the residue was all disposed of, but if the alteration was not made at the time of execution, then one-eighth of the residue was not bequeathed. The decedent

was a copyist, particular in preparing papers, and of such accurate habits in this respect, as not to be likely to issue a formal instrument, containing an important interlineation un-noted. It is probable, therefore, that the interlineation in question was made on the discovery, after the paper was executed, that an eighth of the residue had been omitted. (*Burgoyne* vs. *Showler*, 1 *Robertson*, *p.* 5; *Lushington* vs. *Onslow*, 12 *Jurist*, 465.) This mistake, and the omission of Mr. Spooner's name in the first clause of exhibit No. 1, giving a bequest to "counsel" without naming him, would naturally lead to a revision of the will. For these reasons, if both the wills are genuine, I am satisfied that exhibit No. 1 was first written and executed, and that the will produced by Mr. Peebles is the *last* will.

As a circumstance that may bear slightly upon the due execution of both wills, I may mention that Smith says the transaction occurred near the middle of the afternoon, at 3 or 4 o'clock, while Parsons says it transpired near the middle of the day. Where the testimony of a witness is confessedly affected by his reasoning, and is not given as a matter of pure recollection, it is useful to test the evidence by the statements or conduct of the witness at a time when the facts on which he reasoned were different. After the death of Mr. Graham, it appears that Mr. Peebles applied to the proprietor of Dunlap's hotel, for the delivery of some papers contained in the desk of the deceased. At that time the will produced by Mr. Case had not yet been found, and the will in the possession of Mr. Peebles was the only one supposed to be existing. Mr. Dunlap then requested to see the will. Peebles exhibited it to him, and he called Mr. Smith and asked him "if that was his signature, to the will Peebles had." Mr. Roberts, one of the witnesses, says, "Smith replied, I think, in the affirmative, and, at any rate, the desk was opened and the papers delivered up. I don't remember the precise words, but inferred more from the facts that followed, that the answer of Smith was satisfactory to Dunlap. I am quite sure he did not deny the signature." Mr.

Smith admits that a will was exhibited to him at Dunlap's hotel, by Peebles, who asked him if the signature of his name thereto was in his handwriting.   He says, " I cannot say that the will propounded is the same paper, and I do not recollect what I said to him.   I might have said ' Yes,' knowing that I signed a will for Mr. Graham.   I did not read the paper he showed me.   I have no recollection of telling Mr. Dunlap, that I had seen the will and it was all right, and that upon that representation Mr. Dunlap delivered the papers of the deceased to Mr. Peebles as executor."   Again he says, " He handed me a paper, and I looked at it—I took it one side and read some of it, saw it was a will in fact, and told Mr. Dunlap it was a will, and that he had a right to the other papers."   " Mr. Dunlap was then behind the bar.   I recollect his coming there with a will but once.   I knew Mr. Graham's writing, and I saw the signature to the paper.   I was not particular to look at it ; I noticed only its general appearance.   I cast my eye over the whole paper ; I think I did not say, ' Yes, that's my signature ;' I would not say positively that I did not say so, but I don't think I did, because, if I had seen the signature, I should have known in an instant."   Again, on being re-called, Mr. Smith, on being asked whether he saw his own name on the will shown him by Mr. Peebles, answered, " Well, I think I did."   " I did not examine it close enough to be certain whether it was my handwriting or not."   The question was then put to him :   " Did you say it was ?"   He answered, " Not to my knowledge."— Question : " What did you say when the will was exhibited to you ?"   Answer : " I think I told Mr. Dunlap it was all right."   Question : " Did you suspect it was not the will you had witnessed ?"   Answer : " I did not."

There is some confusion as to the time this will was exhibited.   Mr. Roberts thinks a printed notice of the probate was shown at the same interview.   But Mr. Smith states that he did not see the printed notice when the will was shown, and Mr. Parker says that, when the desk was opened, he

saw the printed notice, but did not see the will. The will and printed notice of probate could not have both been exhibited at the same interview, for, on the citation for probate being issued, the will was deposited in this office. It is argued, therefore, that the will shown Smith was not the one now propounded; but Mr. Parker mentions a fact which I think explains the transaction. He says he went to Dunlap's hotel, at the request of Mr. Case, who stated that the desk was to be opened, that " there was an *appointment* fixed for that time, for Mr. Peebles to come there and open the desk." " It strikes me," he adds, " that Mr. Case said he had seen the will under which Mr. Peebles claimed; that he had been at the surrogate's office and seen it." This makes it probable that the will was first exhibited, and then an *appointment* made for a future meeting, at which time, the will having been deposited in this office, the printed notice was produced. I do not, however, esteem that question of much importance; for, whichever way it might be, one thing is certain, viz., that the will shown Mr. Smith was not the one which he now says is the only one he ever signed, for that *was not found by Mr. Case until after the desk was opened.* The material fact is, that Mr. Smith, before the will offered by Mr. Case was discovered, permitted some other instrument, submitted for his inspection, to pass as genuine, and which, of course, he believed to be genuine. He first says, he does not think he saw the signature of his name, but subsequently thinks that he did, and although he did not examine it close enough to be certain whether it was his writing, admits that he told Mr. Dunlap it was all right, and did not suspect it was not the will he had witnessed. If, therefore, he never signed but one will, he has already been mistaken once, as to the identity of the instrument he did sign.— Again, he stated in his testimony, as one reason for knowing that he signed exhibit No. 1, that it was the way he *always* wrote his name; and yet it was abundantly established that he had frequently written his name in another

manner.   Of six signatures, admitted to be his, now before me, only one is signed David F. Smith, three D. F. Smith, one Fred. and one Frederick Smith.

As to the state of the evidence in regard to the handwriting of the witnesses to the Peebles will, it preponderates in favor of the genuineness of that instrument.   The signature of Mr. Parsons seems almost identical in both. That of Mr. Smith, allowing for the variance from " David F." to " D. Frederick," admits of the same remark, in my judgment.   Indeed, Mr. Parsons himself says that, looking at the signature of his name alone, he sees no reason to doubt its genuineness.   A witness was called, who gave the same opinion, and no effort was made to disprove it.   In respect to Smith's signatures, Mr. Dunlap testified that there was a partial resemblance between both of them and Smith's writing, but not strong enough to identify either; he should rather think that he did, than that he did not, write them both, but his impression was strongest in favor of the one signed " David F. Smith."   Mr. Case says that, as to the signature D. Frederick Smith, there is a resemblance to Smith's writing, and he could not say it was not his; does not believe it to be genuine, from the fact he had never seen it written in that way.   He adds that, at the date of the will, he knew nothing of his signature. Two witnesses were called to impeach the signature " D. Frederick Smith," and expressed the opinion it was not in Smith's writing; but the value of their judgment in the matter may be readily seen, when it is stated that they both gave the same opinion in regard to a number of signatures and letters which Smith acknowledged to be written by him.

The denial of witnesses as to the formalities required by statute, for the due execution of a will, where they do not recollect the occasion of the execution, can have no greater force than the failure of recollection as to the occasion. Of course, if they have forgotten the main occurrence—if they do not remember the transaction as a whole, they do

not remember the parts. If so important a part as the signature of their names as witnesses has escaped recollection, the accompanying incidents must have shared the same fate. The same line of reasoning is applicable where the witnesses corruptly deny their participation in the execution. The denial of the principal event necessarily involves all the details in the same result.

I shall next advert to some other evidence which bears materially upon the case. 1. The testator abode at Dunlap's hotel, Parsons boarded in the same house, and Smith was employed at the Exchange Hotel, next door. If the testator, after having executed one will before these persons, altered and corrected it, it was natural that he should call them in again to witness the new instrument. 2. Smith states that he does not recollect that anything was said at the execution of the will, as to writing his place of residence; and yet he never witnessed a will before; and is not likely to have known of the provision of the statute on that point. 3. The will produced by Mr. Peebles is identified by Mr. Spooner. There was something unusual in the origin of this instrument, which has led to the existence of this testimony. It appears that Mr. Graham was involved in a burdensome litigation, and about the 12th of February, 1850, was apprised by his counsel, Mr. Cutler, that he desired him to secure the services of some other person. Through the intervention of Peebles, the suit was then placed in charge of Mr. Spooner. Having no means at his command, the testator proposed compensating his counsel by some testamentary provision; and, the proceedings in the cause requiring prompt attention, the execution of the will was not likely to be delayed. Now, Mr. Spooner states that he saw the will very soon after its date; that Peebles brought it to him, having previously put into his hands the papers in Graham's suit, and requested him to undertake the case. He had one or two interviews with Mr. Graham, and expressed some reluctance to assume the management of so onerous a case. He says, "After these

interviews with Mr. Graham, Mr. Peebles brought over the will, showed it to me, and I examined it to see what its purport was, and whether it was properly executed. It became necessary for me to see Dr. Graham the same afternoon; I went with Mr. Peebles to Dunlap's hotel, where we saw Dr. Graham together. Mr. Peebles took out that paper and showed it to Dr. Graham, and said he had showed it to me, and it was all right, and I was going to undertake his suit; I then told the Doctor I did not want anything of that kind; I would undertake his suit for him,— he was in poverty,—and argue the motion that was coming on. Dr. Graham said Mr. Peebles had been a good friend of his; he had taken Peebles' advice, and he did not want anybody to work for him for nothing. We then went on and talked about business—the suit in question. There is not the slightest doubt in my mind, the will shown me by Mr. Peebles is the one propounded for proof by him. The impression on my mind is, that I was one-eighth legatee in the will shown me; there was no question in my mind about that; I recollect also, that I was made executor in the will shown me, and also that Mr. Peebles had four-eighths of the estate; that is the impression on my mind. I can't say that I recollect any other of the provisions of the will; I took no particular note of it; there were no interlineations at all in the will shown me; the paper was a clear one; if there had been interlineations I should have noticed it, and commented upon it. When Peebles showed the will to Graham, he took it out, opened it, and showed it to Mr. Graham, holding it in his own hand, and said, I have shown this to Mr. Spooner; I could see it was the same will he had shown me before." * * * " After Mr. Peebles showed Mr. Graham the will, he Mr. Peebles retained the paper, so far as I knew." 4. Mr. Cutler states that a short time before February 12, 1850, the testator " stated repeatedly, that he had made a will in favor of Mr. Peebles, devising his property to Mr. Peebles; or that he intended to make such a will. I think, on one oc-

casion, he said he had made it." 5. Mr. King testifies that on the 25th of February, 1850, on the occasion of a motion made in the suit pending in the Common Pleas, the testator said "he had made his will, and left his property, or the bulk of it, to Mr. Peebles." 6. The will produced by Mr. Case is endorsed,—"Last will and testament of Francis Graham, dated and *executed* the 15th of February, 1850." The will propounded by Mr. Peebles, is endorsed,—"Dated and *executed* the 15th day of February, 1850." Both of these endorsements are in the handwriting of the deceased, and they assert the *execution* of both the instruments, on the same day.

Had the evidence stopped at this point, I do not see how any reasonable doubt could have existed as to the genuineness of both wills. Thinking it, however, a proper case for the examination of the parties producing the instruments, I examined Mr. Peebles and Mr. Case, and a circumstance was somewhat singularly disclosed, still further favoring the ascertainment of the truth in this remarkable case.

7. Mr. Peebles stated that the instrument offered by him for probate, was handed to him by the testator, he thinks the day of its date, to take charge of it, and also for the purpose of seeing whether Mr. Spooner would act under it. He testified that the instrument had remained in his possession until it was deposited in this office for proof.

8. Mr. Case stated, that the will produced by him was found with other papers, in the pocket of an old coat belonging to the deceased, taken from his desk after his death, when it was first opened at Dunlap's hotel, as already mentioned. At that time, Peebles took possession of the papers in the desk, and the coat was thrown aside as worthless. Mr. Case took it home, with Peebles' permission. On learning this fact, I directed Mr. Case to produce all the papers so discovered by him. He did so ; and in the bundle produced were two old wills of the testator, one endorsed, "Last will and testament of Francis Graham, of the city of

New York, dated and executed 30th Oct., 1849;" and the other, " The last will and testament of Francis Graham, 8th Nov., 1849." There was also a wrapper endorsed, "The last will and testament of Francis Graham, 8th Nov., 1849." On a careful examination of the bundle, another wrapper was discovered, having the following endorsement :

"Old

Wills of Francis Graham,

30th Oct., '49.

Vide 8 Nov., '49.

*Revoked by one confided to the care of C. G. Peebles, Esq.*"

All these endorsements are in the handwriting of the deceased ; and the memorandum thus found affords a conclusive corroboration of the fact stated by both Peebles and Spooner, in relation to the custody of the Peebles will. Besides the declaration endorsed on that will by the deceased, that it was *executed* February 15, 1850 ; besides the evidence of Mr. Spooner and Mr. Peebles, establishing that the document was in Mr. Peebles' possession, with the knowledge and approbation of Graham,—we have here, from an unexpected quarter, another declaration in the writing of the deceased, found in the same place where the Case will was discovered, and stating that he had confided his will to the care of Mr. Peebles. Here is a will, written and subscribed by the testator,—endorsed by him as *executed*,—from the character of its contents, evidently a revision of another altered will of the same date,—purporting to be attested by the same persons who witnessed the altered will,—delivered by the testator to one of the executors, for the purpose of exhibiting it to another person,—exhibited to that person alone, and also in the testator's presence,—and retained by the executor until the testator's decease. And on the other hand, we have the altered will found after the testator's death, in his coat pocket, and never shown to have been out of his possession ; and in the same receptacle a memorandum is discovered, declaring that his will had

been entrusted to the charge of his executor. The evidence is circumstantial, but the circumstances are all singularly harmonious, consistent, and sustained by proof from independent and different sources. Mr. Spooner, Mr. Peebles, and the written declaration of the testator, endorsed on the will, all unite to establish its genuineness, and even the memorandum produced by Mr. Case himself, aids in its authentication. By the force of such testimony, in connection with the other facts already considered, I am constrained to the conclusion that the instrument propounded by Mr. Peebles is the last will and testament of Francis Graham, and bears the genuine signatures of the subscribing witnesses.

When the witnesses to a will are dead, or have forgotten the circumstances of the execution, the performance of the formalities required by statute may, after proof of their signatures and that of the testator, be inferred or presumed from the recitals of the *testatum* clause. (*Chaffee* vs. *Baptist Miss. Conv.*, 10 *Paige*, 85 ; *In the Goods of Leach*, 12 *Jurist*, 381.) On the supposition that Parssons and Smith have lost all recollection of the transaction, the court, if satisfied from other evidence that they did in fact witness the will, may admit it to probate. I have no doubt at all that, even when the subscribing witnesses corruptly deny the execution, and, *à fortiori*, where they are mistaken, the proof of the will may be supplied from other sources. It is an error to suppose that the law has invested the subscribing witnesses with absolute power to defeat the ends of justice. It would be a most dangerous doctrine, to hold that the validity of so important an instrument depends entirely on the honesty of the two witnesses, and that if they deny its execution the will inevitably falls. Such may often be the consequence in the absence of any other proof, but it is not a necessary consequence in law ; such a tremendous power is placed in no man. The proof of a will abides by the same rules of evidence as prevail in all other judicial investigations. The question for the court is,

the *factum* of the instrument, and that may be proved in the very teeth of the subscribing witnesses. Suppose (by way of illustration) that a will duly executed, and subscribed by the testator with the witnesses in the presence of a number of disinterested persons, were repudiated by the subscribing witnesses; would it not be competent to prove its due execution by these by-standers?

I am not aware that any case precisely of this kind, has before occurred; but it has often been conceded that a will may be proved against the evidence of subscribing witnesses. The witnesses have frequently been contradicted as to particular facts, such as capacity, the signature of the testator, &c. In *Lowe* vs. *Jolliffe*, 1 *Wm. Bl.*, 365, the three subscribing witnesses to the will, and the two surviving ones to a codicil, and a dozen servants to the testator, all unanimously swore him to be utterly incapable of making a will; and yet the jury were satisfied of the perjury of all the witnesses except one, and the validity of the will was established. In *Jackson* vs. *Christman*, 4 *Wendell R.*, 277, Justice Sutherland said, " If the subscribing witnesses all swear that the will was not duly executed, the devisee may, notwithstanding, go into circumstantial evidence to prove its due execution." In *Hitch* vs. *Wells*, 10 *Beavan*, 84, one of the witnesses was dead, and his signature was proved. Another witness testified that he made his mark to the will, but did not remember that the testatrix signed it. But the other witness denied her signature, and swore that she could not write her name. Five persons were called to prove she could not write, and three to show the contrary. The judge and jury disbelieved her, and a verdict was rendered in favor of the will. On a motion for a new trial, Lord Langdale said, " In a case where one witness is dead, another is not to be believed, and the third witness cannot recollect, everything in favor of the instrument is to be presumed." It is evident in this case, that Baron Alderson, who tried the cause, and the Master of the Rolls, both acceded to the position that the will could be

proved notwithstanding the denial of its execution by one of the subscribing witnesses. There are other cases which go to sustain the same doctrine (*Handy* vs. *The State*, 7 *Har. & Johns.*, 42 ; *Dudleys* vs. *Dudleys*, 3 *Leigh.*, 436 ; *Le Breton* vs. *Fletcher*, 2 *Hagg.*, 558 ; *Mackenzie.* vs. *Handasyde*, 2 *ibid*, 211 ; *Landon* vs. *Nettleship*, 2 *Add.*, 245 ; *Keating* vs. *Brooks*, 4 *Notes of Cases*, 253) ; and in the English ecclesiastical courts, even after the recent act of Victoria (1 *Victoria, ch.* 26), respecting the execution of wills, probate has been decreed where the witnesses have explicitly denied some of the formal requisites of due execution ; lapse of time and other circumstances being laid hold of by the judge to show that the witnesses had forgotten or were mistaken. (*Chambers* vs. *The Queen's Proctor*, 2 *Curteis*, 433 ; *Gove* vs. *Gawen*, 3 *ibid.*, 151 ; *Blake* vs. *Knight, ibid.*, 547 ; *Burgoyne* vs. *Showler*, 1 *Robertson, p.* 5.) But, apart from all decisions, there seems to me abundant authority for the position I maintain, in the elementary principles of reason and justice. The law seeks the truth ; and the idea of clothing the evidence of any person with such a peculiar character that the opposing party is precluded from showing its falsity, is alike perilous and novel. As to the effect, nature and character of their testimony, the subscribing witnesses to a will stand on the same ground as other witnesses, on the subject of contradiction. They are not presumed to be infallible, nor is their evidence conclusive. They have no immunity from contradiction ; and if untruth, mistake or want of recollection be alleged, it is not only competent to prove it, but on its being proven, and the judge being satisfied of the validity of the will, decree of probate should follow.

The counsel for the contestant urged that evidence of handwriting could not be taken to prove the signatures of the subscribing witnesses, except in the precise contingencies mentioned in two sections of the statute—that is, where the witnesses are dead, insane, out of the State, or incompetent to testify. (2 *R. S., p.* 58, § 9 ; *Laws* 1837, *ch.*

460, § 20.) But these sections are directory only in the instances specified, and are not obligatory in other cases not specified. They are not exclusive of the power necessarily resident in every court, to admit all competent proof material to a pending issue. An attempt was made in the Revised Statutes, to codify the law so far as it could well be done, in order to afford a convenient guide for surrogates in the administration of their powers and duties. So far as these directions go, they are to be followed, but a case beyond their limit and not provided for, remains to be dealt with according to the general principles prevailing in all tribunals. Having jurisdiction of the subject matter, the Surrogate, where the course of procedure is not laid down, must dispose of it according to the established rules of evidence, unless he has been restrained from doing so by express statutory provision. The principal subject of jurisdiction, the probate of the will, carries every proper incident along with it, in all cases where the statute is silent as to the course of proceeding. (*Laws of* 1837, *ch.* 460, § 71.) I am satisfied, therefore, that it was competent for me in this case, to take proof of the handwriting of the testator and of the subscribing witnesses, or of any other facts and circumstances tending to show the witnesses were mistaken, and that the will was duly executed; and having come to the conclusion that the will was executed according to law, it is my duty to give sentence of probate.