## SUPREME COURT.

THE PEOPLE *ex rel.* THE BROOKLYN INDUSTRIAL SCHOOL AND HOME FOR DESTITUTE CHILDREN agt. THOMAS KEARNEY.

A *father* has authority, under the statute and the common law, by *deed* or *will* duly executed, to dispose of the *custody* and *tuition* of his *infant children* during their minority, or for any shorter period, to any person or persons; and the person to whom it shall be made shall have all the rights and powers, and be subject to the duties and obligations of the *guardian* of such infants; and such disposition shall be valid and effectual against every other person claiming the custody or tuition of such infants as guardian in soccage or otherwise.

A *surrogate s* power and authority to appoint a guardian for an *infant* exists only where the father has failed to appoint by deed or will.

A father, four days before his death, executed and delivered an instrument, as follows: "I, John Laffin, of the city of Brooklyn, father of Catharine or Kate, and Mary Ann Josephine Laffin, do commit and surrender said children to the care and management of the Brooklyn Industrial School Association and Home for Destitute Children, with the powers and subject to the provisions contained in the act incorporating the said association and home. Dated Brooklyn, December 13, 1858." Signed by John Laffin, and witnessed by two witnesses.

*Held*, that such disposition was as valid and effectual as if it had been made under the first two sections of the general act concerning guardians and wards, it being

made in conformity with the act incorporating the relator as a charitable institution; and that a subsequent appointment under the general act of the grandfather of the infants, a guardian for such infants, by the surrogate of Kings county, was of no force as affecting the testamentary disposition before made by the father.

Also, *held*, that the appearance and opposition of the relator, before the surrogate, to the appointment of the grandfather as guardian, whereby the surrogate pronounced the testamentary deed of the relator invalid, was not to be regarded as a decision *res adjudicata* upon *habeas corpus* to discharge the children from the custody of the relator.

Again, *held*, that the children remaining with their father from the date of the execution of the testamentary deed until his death, some four days, did not have the effect to convert the transaction from a *present* to a *prospective* surrender of them.

*Poughkeepsie General Term, May*, 1860.

*Present,* LOTT, EMOTT, BROWN *and* SCRUGHAM, *Justices.*

JOHN LAFFIN, of Brooklyn, died December 17th, 1858, intestate, leaving two children, Catharine, aged about five, and Mary Ann, about three years of age, and no widow. December 13th, 1858, he executed and delivered an instrument in writing, as follows :

" I, John Laffin, of the city of Brooklyn, father of Catharine or Kate, and Mary Ann Josephine Laffin, do commit and surrender said children to the care and management of the Brooklyn Industrial School Association and Home for Destitute Children, with the powers and subject to the provisions contained in the act incorporating the said association and home.

" Dated, Brooklyn, Dec. 13th, 1858.

his

JOHN X LAFFIN,

mark.

" Witness, Anne Kimberly.

" Witness, Susan C. Smith."

The following was written on the margin :

" Catharine Laffin, born 26th October, 1853.

" Mary Ann Josephine Laffin, born 19th Oct., 1855."

The children remained with their father until his death, when they were taken by the Brooklyn Industrial School

Association, and they remained with them until the decision on the *habeas corpus* in this case.

On the 22d of December, 1858, Thomas Kearney, the maternal grandfather of said children, presented a petition to the surrogate of the county of Kings, asking to be appointed guardian of the persons and estates of said children. Notice of hearing was served on James Laffin, an uncle, and Ann Nolan, an aunt of said minors, on their father's side. At the hearing Jesse C. Smith, Esq., appeared as counsel for the Brooklyn Industrial School Association and Home for Destitute Children, and filed an affidavit proving the execution of said surrender, and claimed that the surrogate had no jurisdiction to appoint a guardian for said minors, by reason of the surrender. The surrogate decided that he had jurisdiction to appoint a suitable person as guardian of the minors under the statute, notwithstanding the act of 1857 incorporating the Brooklyn Industrial School Association.

Mr. Smith also appeared before the surrogate for James Laffin and Ann Nolin, and after the decision of the surrogate that he had jurisdiction, as above stated, an application was filed by James Laffin to be appointed guardian of said minor children.

Testimony was taken before the surrogate as to which of the two applicants, Thomas Kearney, the grandfather, or Jas. Laffin, the uncle, should be appointed guardian, and the surrender above set forth was offered in evidence on the part of James Laffin, for the purpose of showing the wish of John Laffin, the father of said children, as to the care and custody of the children, and the manner in which they should be brought up, and it was ruled out by the surrogate.

The surrogate, after hearing both parties, appointed Thomas Kearney, the grandfather, guardian of the persons and estates of said children, until they should arrive at the age of fourteen years, and until another guardian should be appointed. Thereupon Thomas Kearney, the relator, as

such guardian, presented a petition to SAMUEL D. MORRIS, Esq., county judge of Kings county, stating that said Catharine and Mary Ann Laffin were detained and restrained from their liberty in the city of Brooklyn, by the Brooklyn Industrial School Association and Home for Destitute Children, the respondents, and asked for a *habeas corpus*, commanding the respondents to bring said children before him.

A *habeas corpus* was thereupon issued and served. On the 31st of March, 1859, the relator and respondents appeared before the county judge, and the respondents made a return under oath, claiming the custody of said children, under the surrender hereinbefore set forth.

The relator traversed the said return, and denied that the children were detained by any valid process or authority; denied that they were surrendered in any legal manner; averred that John Laffin, when he executed said surrender, was of unsound mind; that the respondents used undue influence to obtain said surrender. He also alleged that the respondents had appeared before the surrogate, and opposed the appointment of the relator as guardian, and had offered the surrender as a reason why he should not be appointed, and that the same was considered by said surrogate, and was pronounced insufficient and invalid, and that, therefore, the legality and sufficiency of the surrender was passed upon by said surrogate, and was an adjudication as to its validity.

The respondents offered in evidence the surrender proved before a commissioner of deeds, and rested their testimony.

The relator called several witnesses to show that John Laffin was not of sound mind at the time he executed the surrender.

The respondents then gave testimony showing that John Laffin was of sound mind, and was not operated upon by undue influence, and proved also the facts which took place upon the execution of said surrender.

The county judge, after hearing the testimony, and summing up by the counsel for the respective parties on the 16th day of May, 1859, made an order discharging the children from the custody of the respondents, and ordering them to be delivered to the relator, Thomas Kearney, on two grounds :

*First.*—That the decision of the surrogate, upon the surrender, was *res adjudicata*, and that the surrogate having pronounced the surrender invalid, the county judge was bound by such decision; and

*Second.*—That the surrender was conditional, and not to take effect until the death of John Laffin, and, therefore, invalid.

Jesse C. Smith, *for the relator.*

John Greenwood, *for the respondent.*

By the court, Brown, Justice. This is a *certiorari*, brought to remove and review certain proceedings upon a *habeas corpus*, had before S. D. Morris, Esq., county judge of Kings county, in which he awarded the custody of Catharine Laffin and Mary Ann Josephine Laffin, infant children of John Laffin, deceased, to the defendant, Thomas Kearney. The relator claimed the custody of the children, by virtue of an instrument in writing, executed by John Laffin, the father, on the 13th December, 1858, and just before his death, and the defendant claimed the care and control as their guardian, duly appointed by the surrogate of the county of Kings, on the 2d March, 1859. The infants are of very tender years, the eldest, Catharine, having been born on the 26th October, 1853, and the other, Mary Ann, on the 19th of October, 1855. The death of their father left them both orphans, without property or means of support, in fact both at the time their father executed the instrument of the 13th December, 1858, and also when the defendant procured himself to be appointed their guardian,

were in a state of utter poverty and destitution, and have so remained to the present time.

At the common law the parents are the guardians of their infant children; first the father, and if he be dead, the mother. This results from the nature of the relation between parent and child, and is a recognition of the ties, duties and obligations which bind them to each other. By the 5th section of the act in regard to the tenure of real property, when an estate in lands becomes vested in an infant, the guardianship of such infant, with the rights, powers and duties of a guardian in soccage, shall belong, first, to the father, and if there be no father, to the mother, and if neither father or mother, to the other relatives of the infant. This class of guardians would have authority to take charge of the whole estate, both real and personal. But where there is no real estate, the father, as the guardian by nature, has no power over the personal estate of his infant child. The rights and authority of this class of guardians are in all cases superceded, where a guardian is appointed by the deed or last will of the father, or in default thereof by the surrogate. (2 *Kent's Com.*, 224.) The first section of the act concerning guardians and wards, gives to the father power by deed or will, duly executed, to dispose of the custody and tuition of his infant children during their minority, or for any shorter period, to any person or persons. And § 2 declares that the person to whom it shall be made, shall have all the rights and powers, and be subject to the duties and obligations of the guardian of such infants, and such disposition shall be valid and effectual against every other person claiming the custody or tuition of such infant, as guardian in soccage or otherwise. I am thus particular to refer to these rules of the common and statute law, for the purpose of keeping in mind that the power of the father as a natural guardian of his infant children while living, and his power to appoint a testamentary guardian for them during their minority

after his death, has always been maintained, and still remains unimpaired.

The power of the surrogate under the act concerning guardians and wards, is not limited to that favored class of infants who are endowed with estate, real or personal. He may doubtless appoint a guardian for the infant inmate of a poor-house, without property, and without name or lineage. But it would be vain to deny that the statute, and the practice under it, has reference specially and particularly, nay, almost exclusively, to the former class. This is manifest from the various provisions in regard to bonds with securities, for ascertaining the value of the infant's property, and for the keeping, rendering and settling accounts, and for compensation and recompense for expenses and services, and for the removal of the guardian for incompetency, or other dereliction of duty. These numerous and complicated provisions can have no possible application to those minors whose condition is orphanage and destitution. The guardian is not bound to support and maintain his ward from his own means. The law imposes upon him no such duty; he may provide for them from humanity, from the impulses of sympathy and charity; but the moment the ward's property and substance is exhausted, the legal duty and obligation of the guardian is at an end, for he owes none which the law will enforce. If Thomas Kearney should abandon these helpless children, there is nothing for them but what the laws for the support of the poor may afford, or the charities of some such institution as that from which the order of the county judge has separated them.

The relator is an institution incorporated by the act of the 15th of April, 1857. Its objects are purely charitable, maintained by private beneficence, and designed to provide guardians, or quasi guardians, for those children of poverty and indigence, who are left by obvious causes outside of the operation of the general law in relation to guardian and

ward. In the language of the act of incorporation, the associates are constituted a body corporate, " by the name of the Brooklyn Industrial School Association and Home for Destitute Children, whose object and business shall be to establish and support industrial schools, and to establish and maintain a home for destitute children in the city of of Brooklyn." The 6th section of the act authorizes the surrender of infant children by their natural or other legal guardian, to the care and management of the association by any instrument or declaration in writing, and then proceeds to prescribe the duties of the association in respect to such children. Section 7 declares, that upon the death, absence or incapacity of the father, the mother may make the surrender, and if she be dead or otherwise incapable, then the mayor of the city of Brooklyn, or the surrogate of the county of Kings may perform the same office. The act contains other and ample provisions for the binding out and apprenticing these children, and for their care, education and protection by the association, which it is not necessary to quote at large. The provision in the 6th section is a recognition of the ancient right of the father to provide a guardian for his infant child by deed or will, and the instrument in writing there referred to, by which the surrender is to be made to the association, is a substitute for the deed or last will mentioned in the 1st section of the act concerning guardians and wards, in cases where the poverty and indigence of the parents and children would leave the general act practically inoperative and unavailing. The instrument in writing by which the relator claimed the custody of the children, was duly executed by their father, John Laffin, in the presence of two witnesses, on the 13th December, 1858, and four days thereafter he died. The children remained with him until his death, and were then taken away by the relator. Thomas Kearney, who is their grandfather, caused himself to be appointed their guardian by the surrogate, on the 2d March, 1859 ; and on

the 29th March he sued out the writ of *habeas corpus*, and instituted the proceeding under which they were, by the order of the county judge, taken from the custody of the relator and delivered over to the defendant, on the 16th of May thereafter. The issue between the parties in the proceedings, upon the return to the writ of *habeas corpus*, was the right to the custody of the children, and this depended upon the question, whether the appointment of the general guardian by the surrogate, superceded and rendered inoperative and void the appointment and surrender made by John Laffin, the father, to the relators, by the written instrument of the 13th December, 1858. The two first sections of the act concerning guardians and wards, and under which act the defendant, Kearney, derives his authority, were made in affirmation and assurance of the father's right to dispose of the custody and tuition of his infant children during their minority, by deed or by his last will and testament. " A will merely appointing a testamentary guardian need not be proved, and though the statute speaks of appointments by deed as well as by will, yet such a disposition by deed may be revoked by will; and it is evident from the language of the English statute, and from the reason of the thing that the deed there mentioned is only a testamentary instrument in the form of a deed, and to operate only in the event of the father's death." (2 *Kent's Com.*, 225.) The disposition which John Laffin made of his children was as valid and effectual as if it had been made under the two first sections of the general act, for it was made in exact conformity with a requisition of the 6th section of the act, incorporating the relator; and the children were of the class which the act of incorporation was designed to protect and benefit. To give to the appointment of guardian by the surrogate, under the general act, the force claimed for it by the defendant would be to impair the right of the father to dispose of the tuition and custody of his infant children, and virtually to set

aside the wise and humane provisions of the act incorporat-
ing the relator. Besides, the surrogate's power and autho-
rity to appoint a guardian for an infant, exists only where
the father has failed to appoint by deed or will (§ 4); and
although it may not be necessary to determine upon this
appeal the question of the surrogate's jurisdiction, it is
evident, I think, that the guardian he did appoint must
hold whatever authority he has, subject to the superior
right of the relator to the care and custody of the children
under the appointment and surrender made by the father
in his lifetime. It occasionally happens that letters of
administration are granted upon the estate of a deceased
person, when there is a will in existence unknown and
unproved at the time which disposes of the entire estate.
Upon proof of the will, the administrator and all his rights
and duties under the letters, are superceded by the will, and
must yield to the superior right of the deceased in his life-
time, to dispose of his effects through executors of his own
appointment, at his own pleasure. So, also, it may occur
that statutory guardians for infants may be appointed when
there is a deed or will in existence, appointing testamentary
guardians for these same children, which may be undis-
covered and unknown at the time. In this case, also, it
cannot be doubted that the statutory guardians would be
superceded, and their powers suspended by the production
of the deed or will appointing others to execute the same
trusts.

It was said upon the argument, that the decision of the
surrogate in awarding the letters of guardianship to the
defendant, concludes the relator in the proceedings upon the
*habeas corpus.* That the question is *res adjudicata.* There
are two very sufficient answers, I think, to this proposition.
To entitle the surrogate's adjudication to this weight, it
must have been directly upon the point in controversy, and
between the same parties, and the surrogate must have had
cognizance and jurisdiction of the same question litigated

in the proceedings upon the writ of *habeas corpus*. The first answer is, that the relator was not, and could not have been made a party to the proceeding before the surrogate. The surrogate's court is a court of special and limited jurisdiction, and must proceed to exercise its powers according to the letter of the statute from which it derives them. Its authority in regard to parties, upon a petition for the appointment of a guardian, is to be found in the 5th section of the act. The parties, other than the petitioner, are limited to the relatives of the minor residing in the county. The person to whom the minor may have been apprenticed by indenture, or to whose care and custody he may have been committed by the deed or will of the father, cannot be made, nor can he make himself a party to such an application, so as to be concluded by the judgment or decree, for the very obvious reason that the act has given the surrogate no such authority. It prescribes what he shall do, and who he may call before him to be bound and concluded by his decrees. The voluntary appearance of the counsel for the relator before the surrogate, upon the hearing of Thomas Kearney's application, did not conclude or affect its right to the custody of the children. The next answer to the point of *res adjudicata* is, that the right to the custody of the infants was not the question before or determined by the surrogate. His power was limited to an examination and determination into the fitness of the proposed guardian, the value of the infant's personal estate, and the rents and profits of his real estate, and to fix the amount and the sufficiency of the security to be given. The force and effect of the letters of guardianship, and the power of the guardian under them, was not a subject for the surrogate's consideration. They might, or they might not, invest the person appointed with a right to the control and custody of the infants, as the extraneous circumstances might happen to be. But that was not for the surrogate to settle. He issued the letters, and when the appointee came

to assert rights under them, as against third persons, standing in the situation of the relator, then those rights being purely incidental to the appointment, would become proper subjects for consideration and adjudication.

It was said upon the argument that the surrender mentioned in the 6th and 7th sections of the act, incorporating the relator, is intended to be a present act, and to place the association immediately in *loco parentis.* That the term *ex vi termini* implies a present act. Strictly speaking this may be so; but it would be a most narrow and illiberal construction to apply the rule literally to this act, which is purely charitable, and which in no possible contingency can interfere with the rights of property. Especially would this be so when the opposite construction does no more than give effect in another form to the father's right to appoint a testamentary guardian for his infant children. But concede its application for the present, and what is there upon the face of the instrument of the 13th December, 1858, or in the evidence, to show that the surrender by John Laffin to the relator, was not a present act. The instrument imports an absolute and immediate surrender. He was, at the time it was executed, in the last stage of an incurable disease, and was awaiting his dissolution hourly. He asked that his children might remain with him during the brief period that yet remained to him of life. To this last request of a dying father those representing the association assented. How could they do otherwise, and with what reason can it be said, that suffering these little children to remain with their father for a few days or hours until he expired, and the last act of life was concluded and consummated, converted the transaction from a present to a prospective surrender.

Something is said in the opinion which accompanies the order appealed from, touching the incapacity of John Laffin at the time he executed the instrument of surrender; but as there is no proof whatever to show such want of mental

capacity, the counsel wisely omitted to refer to it upon the argument.

It is the duty of the courts to carry out the manifest intention of the legislature, and give effect to the humane and charitable provisions of the act, which incorporates and creates the relator, but it must be evident to the most ordinary apprehension, that if the relatives of destitute orphan children committed to its care and supervision by the written instrument of the parent, can reclaim and recover their custody under authority derived from the general statute concerning guardians and wards, the act of incorporation may in many cases be rendered nugatory and ineffectual to accomplish any useful or valuable purpose.

The proceedings and order of the county judge should be reversed, with costs, and restitution of the two infant children referred to in the proceedings is ordered.

