Judgment reversed, with costs to appellant against respondent.

---

(40 Misc. Rep. 575.)

### In re JACQUET.

#### (Surrogate's Court, Monroe County.   May, 1903.)

1. GUARDIAN—VACATING APPOINTMENT.
   Where, without notice to the father of certain infants, on petition of the mother, their aunt was appointed guardian, the order will be vacated.
2. SAME—QUALIFICATIONS.
   A father, who has been adjudged guilty of intoxication and petit larceny, will not be appointed guardian of his minor children.
3. SAME—RELIGIOUS EDUCATION OF WARD..
   Where a father and mother were Catholics, their children, when committed to the care of a guardian, must be brought up as Catholics.

In the matter of the guardianship of Alfred and Charles Jacquet. Petition by father to revoke letters of guardianship issued to Clara Lerch.  Letters revoked.

Eugene J. Dwyer, for petitioners.
Francis S. Macomber, for guardian.

BENTON, S.  Mrs. Clara Lerch, aunt to the infants above named, was appointed guardian of the person of each of them on the 29th day of May, 1902.  The infants' mother was then an inmate of the Rochester State Hospital..  The petition stated that the father had deserted said infants, and his whereabouts, or whether he was alive or dead, were unknown to the petitioner.  At that time, however, he was in fact a resident of this city, and was, therefore, entitled to notice of the application for the appointment of a guardian of his children, although at that time the family was broken up, and he was not supporting his wife or children.  Thereafter, and in June following, he commenced proceedings in this court to revoke the former letters, and prayed for his own appointment as guardian of his said children.

The absolute power of the court to appoint a guardian other than either parent cannot be disputed.  The welfare of the child is the primary. consideration.  The law would develop good character, giving the community a useful member, the state and nation a dutiful citizen.  There are, nevertheless, certain considerations in the exercise of this power which cannot be and should not be ignored.  In the absence of statutory regulations and manifest unfitness, the father, as between himself and his wife, is entitled to the custody of his

infant ·children. His right is paramount, and will be enforced; nor can he at common law alienate that right, not even by articles of separation with his wife. People v. Mercein, 3 Hill, 399, 38 Am. Dec. 644: "The father is the natural guardian of his infant children, and, in the absence of good and sufficient reasons shown to the court, such as ill usage, grossly immoral principles or habits, want of ability, etc., is entitled to their care, custody, and education. All the authorities concur in this point." People ex rel. Nickerson v. ————, 19 Wend. 16: "The interference of the court with the relation of father and child, etc., is a delicate and strong measure; and the power should never be exerted except for the most sound and solid reasons." That such reasons may and do exist in certain cases is not and cannot be denied. If it clearly appears to the court that the child's welfare will be promoted by taking its custody from either the father or mother, or from both, and giving it to a stranger, it becomes the duty of the court so to do. By statute in this state "a married woman is a joint guardian of her children with her husband, with equal powers, rights, and duties in regard to them." 3 Heydecker, Gen. Laws, p. 3957, c. 48, § 51.

Another question has been raised by the parties to this litigation, and by the prominence they have given it in the pleadings and upon the trial and argument it has become the most important question involved, and that is the religious training of these children. Liberty of conscience is a fundamental right of American citizenship. Most of us believe with Jefferson that religion is a matter which lies solely between man and his God, and that he owes accountability to none other for his faith and worship. It is said in Watson v. Jones, 13 Wall. 679, 728, 20 L. Ed. 666, that:

"In this country the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all. The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect."

But these principles and rights appertain in full only to those who have reached majority or mature judgment. During the period of immaturity incident to infancy the father and mother are the natural guardians of their children. They must shield them from dangers and temptations that beset not only their physical and moral, but also their spiritual, welfare. ·It is for them to lead in the path of a religion of their own choosing. If they agree, no question can arise; but here a case of disagreement is claimed. Both parties were Catholics. They were married· in the Catholic faith. The ancestry of the children, so far as shown, is Roman Catholic. So far as the father makes religious profession, he is a Catholic; but it must be found upon the evidence that his practice has not conformed to the profession of any religious creed. He has been convicted of petit larceny and of intoxication. He was committed to the State Industrial School, and has been an inmate of the penitentiary under convictions, yet he produces evidence of his associates, if not employers, as to his efficiency as an employé, which is to his credit. His mother says of

his habits, "He was always temperate, and it is very seldom he breaks out." He expresses his urgent desire that his children be reared in the Catholic faith, and that is also the wish of his mother. Of late, prior to her loss of mind, the mother of the children, to Protestants declared herself to be a Protestant, and expressed the wish that the children be educated in the Protestant faith. It is also in evidence that to Father Sinclair she expressed a very earnest hope that the children would be brought up in the Catholic faith. The authorities in whose care the children were at and prior to the appointment of Mrs. Lerch were informed by the mother of the children that she was a Protestant, and in good faith acted upon that information. Upon the evidence given—and it has taken a wide range, and involved persons other than the actual parties to this transaction—this court must now decide as to whether its power shall be used for the rearing of the children under Catholic or Protestant influences. In England the question of religious preferences as between father and mother has been decided very forcefully in favor of the father. In Matter of Scanlan, L. R. 40 Ch. Div. 200, 213, the court cites an authority with approval, holding the guardian was to have sacred regard to the religion of the father in dealing with the child, and, unless under very special circumstances, to see that the child is brought up in the religious faith of the father, whatever that religion may have been. It seems to me to have been squarely held there that the father has the absolute right in his lifetime to decide what religious education the child shall receive, and after his death the guardians are to follow out his wish. In Matter of De Marcellin, 4 Redf. 299, and affirmed in 24 Hun, 207, it is said: "All authorities agree that the expressed wish of the parents of a child, and particularly of the father, should have great weight with the court in the appointment of a guardian." The question of religion seems to have been involved in that case. While the ancient doctrine of patria potestas is only now an historical fact, and the common-law merger of the existence of the wife into that of her husband has ceased, while the wife is now in most respects the legal equal of her husband, yet the headship of the husband in the family is something more than mere sentiment. It is his name which is perpetuated, and his character should shape the conduct, and his ability achieve the success, of the household. In the nature of things, it must still remain true that the father, though not in a tyrannical or opprobrious way, should be the head of the family.

The cases in the books are not numerous. Fortunately, questions of religious faith are but seldom subjects of legal issues. It has been made basic in this proceeding. Upon the preponderance of the evidence as presented here, principle and authority impel this court to commit these children to Catholic guardianship until maturity shall give to each that absolute freedom of choice of a religious belief that his judgment and conscience approves, which is the birthright of his American citizenship. The suggestions urged by counsel in favor of the appointment of the grandmother, Mrs. Catharine Harvey, meet my approval. I think, under all the circumstances of these cases, it is preferable to award her the temporary guardianship. The let-

ters of Mrs. Lerch are in each case revoked. Letters of temporary guardianship of the person and property may be granted Mrs. Catharine Harvey on her filing a bond in the penalty of $200 in each case and taking the oath of office, subject to further application upon settling the decree. Findings may be drawn and decrees settled and entered on appearance in open court or on two days' notice by either counsel to the other. The stenographer's fee of $22.25 is hereby allowed as a disbursement of this proceeding.

Letters in each case revoked.