Appeal from Municipal Court, Borough of Brooklyn, Sixth District.

Action by Henry A. King against the Nassau Electric Railroad Company. Judgment for plaintiff, and defendant appeals. Reversed, and new trial ordered.

Argued before WOODWARD, JENKS, HOOKER, GAYNOR, and RICH, JJ.

A. M. Williams, for appellant.

Fullerton Wells, for respondent.

JENKS, J. The plaintiff became a passenger on one of the defendant's street surface cars, and upon request was given a transfer ticket. He was carried to a point where another line of the defendant intersected. The two lines ran along separate streets and in different directions. He entered a car of the second line, and when he offered the said transfer ticket for his fare it was refused, and he was compelled to pay a 5-cent fare. He has recovered $50 as a penalty, and 5 cents excess fare. It appears that the said lines were owned by the defendant and that neither was operated under a lease. The judgment cannot be upheld under section 101 of the railroad law (Laws 1890, p. 1113, c. 565), for the plaintiff was not seeking a continuous ride or a continuous passage under section 101 of the railroad law; nor did he show that the defendant was within the purview of section 104 thereof. O'Connor v. Brooklyn Heights R. R. Co., 123 App. Div. 784, 108 N. Y. Supp. 471.

It is quite true that the defendant issued a transfer which purported to be valid on the second line; but it does not appear from the record, but the contrary, that it was legally required to do so. If it was not thus required, but could legally require the payment of a 5-cent fare on the second line, then it neither asked nor received more than the lawful rate of fare for the passage upon its second line, and hence it is not subject to an action for the penalty prescribed by section 39 of the railroad law. Its liability, if any, for its voluntary issue of a transfer which it represented as valid upon the second line, its subsequent refusal to accept it upon that line, and its exaction of a fare, presents a question not involved in this action.

The judgment is reversed, and a new trial ordered; costs to abide the event. All concur.

---

(60 Misc. Rep. 22.)

## In re McCONNON et al.

(Surrogate's Court, New York County. June, 1908.)

GUARDIAN AND WARD—PERSONS ENTITLED.

     After the death of their mother a stepfather was appointed guardian of his stepchildren, with the consent of the sisters of their deceased father. He was a zealous Protestant, and the father of the infants was a Catholic, and one of the infants expressed the desire to continue in his father's church. *Held*, that the letters would be revoked, and the paternal aunts of the infants adhering to the Catholic faith appointed guardians.

In the matter of the McConnon infants. Application to revoke letters of guardianship. Application granted.

Owen W. Bohan, for petitioner.
Samuel Levy, for respondent.

BECKETT, S. Section 2832 of the Code of Procedure provides that the ward or any relative, upon a written petition setting forth the facts, may pray for a decree revoking letters of guardianship, either of the person or of the property, in certain specified cases, one of which is (in the case of the guardianship of the person) where the infant's welfare will be promoted by the appointment of another guardian. It appears in this matter that Mr. William Hutchinson was the stepfather of the two infants, he having married their mother after the death of their own father. In February, 1908, he applied for his own appointment as the general guardian of the person and estate of both of the infants, they being under 14 years of age. Their own father's name was James McConnon. He was a Catholic. His nearest relatives were Rose McKelvey and Ellen Traynor, his sisters, also Catholics. Mrs. McKelvey and Mrs. Traynor executed the usual consent that Mr. Hutchinson should be appointed such general guardian, and he was so appointed on February 18, 1908, and as far as it appears from the evidence before me he duly qualified as such guardian, collected the infants' moneys, and properly cared for the same.

Respecting the charges that have been made against Mr. Hutchinson as to his character and conduct I am not satisfied from the preponderance of the evidence that the same have been established or proven. There is evidence indicating that he has been a good stepfather to the children, that he has undoubtedly aided in their support and maintenance, and I dismiss the charges and insinuations against his character and conduct as not established or proven. He has specifically denied the same on the witness stand, and I believe him. At the same time he is a pronounced Protestant. From my observation of the witnesses I should say that one side were as determined in their Catholic as the other side, the guardian, is zealous in his Protestant faith. It has been pronounced on both sides. It has been established that the father of these infants, James McConnon, was a Catholic, born a Catholic, lived a Catholic, and died in the Catholic faith, and his son, one of the infants here, now 10 years of age, of intelligence sufficient in my judgment to comprehend the nature of an oath, has gone upon the witness stand and has clearly told his own life history, which shows me that during the life of his father and afterward, even up to the time that his mother went to the hospital, which was about one year after she had married Mr. Hutchinson, he (the boy) attended the church of his father, and, indeed, was there connected as an altar boy with the formal services and ceremonies of that religion, and he expresses upon the witness stand a desire to continue in the church of his father. His testimony is clear and has weight with me, and I have also taken pains to examine him and his sister separate and apart from any of the parties in this proceeding.

Now, as to the aunt of these infants, Mrs. Rose McKelvey, the peti-

tioner herein, she has given testimony which satisfies my mind that she has had experience in the care and nurture of children; she having practically been the guardian of infant children who were her nephews and nieces, bringing them up and caring for them for several years. It is true that she and Mrs. Traynor executed consent that Mr. Hutchinson should be appointed general guardian; but I know no reason why that should be binding forever, and circumstances or conditions arising afterward certainly would justify the institution of a proceeding to remove a guardian, notwithstanding the execution of such a consent. In making this decision I rely upon Matter of Jacquet, 40 Misc. Rep. 575, 82 N. Y. Supp. 986, a case quite similar to the present matter. In that case, also, the father was a Catholic; but the mother of the children declared herself to be a Protestant, and expressed the wish that the children be educated in the Protestant faith. The court there held that it must decide as to whether its powers should be used for the rearing of the children under Catholic or Protestant influence, citing an English case as an authority that the guardian should have a sacred regard to the religion of the father in dealing with the child; that the father has the absolute right in his lifetime to decide what religious education the child shall receive, and after his death the guardians are to follow out his wish. This case was decided by the surrogate of Monroe county. It is very much in point here, and the surrogate said in conclusion:

"Upon the preponderance of the evidence as presented here, principle and authority impel this court to commit these children to Catholic guardianship until maturity shall give to each that absolute freedom of choice of religious belief that his judgment and conscience approve which is the birthright of his American citizenship."

My attention has also been called by the attorney for the petitioner to Matter of Crickard, 52 Misc. Rep. 63, 102 N. Y. Supp. 440, which seems to lay down the same rule. I believe that welfare of infants is best promoted by bringing them up in the faith of their fathers.

Accordingly I will revoke William Hutchinson's letters of guardianship of the person of these infants, and I will appoint in his place as guardian of the person their aunt, their father's sister, Rose McKelvey, upon her giving a bond in the penal sum, in the case of each infant, of $250.

Decreed accordingly.

(60 Misc. Rep. 28.)

### In re BENNETT'S WILL.

(Surrogate's Court, Kings County. June, 1908.)

EXECUTORS AND ADMINISTRATORS—DISQUALIFICATION.

Though a question exists as to the ultimate disposition of the estate, in the determination of which the interests of the children of the executors will be adverse to the interest of certain claimants, it is no ground for the withholding of the letters from the executors.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 22, Executors and Administrators, § 32.]

In the matter of the probate of the will of Adolphus Bennett. Application to withhold letters testamentary denied.