## BENNETT vs. BYRNE and others.

Upon the appointment of a general guardian for an infant, by a surrogate, the surrogate should ascertain, by the examination of witnesses, the probable amount of the personal estate, and of the income of the realty during the minority of the infant. And he should direct the guardian to give a bond, with sureties, in double that amount; and should require the sureties to justify in at least the amount of the penalty of such bond.

In making an appointment of a guardian for an infant, the true interest of the infant is to be consulted, rather than the interests, or the wishes, of those who are desirous of the guardianship.

The fact that the mother of an infant, upon her death-bed, expressed the wish that a particular relative should adopt such infant and bring it up as his own, and should see that its property was not wasted, should have a preponderating influence with the surrogate, other things being equal, in favor of the appointment of such person as guardian of the infant.

The probability, if a particular person should be appointed guardian of an infant, that the estate will be subjected to the expense of a new appointment, within a very short time, and to the other expenses incident to a change of guardianship, is a circumstance entitled to some weight in favor of the appointment of another person, by the surrogate.

Where a person, applying to be appointed guardian of an infant, is already the trustee of such infant, for the purpose of expending the income of an estate for his support and education, it is a circumstance in favor of his appointment as such guardian; in order that the infant may not be subjected to the expense of separate accounts of the expenditures for his support; the one on the part of the trustee, and the other by the guardian.

THIS was an appeal, from an order of the surrogate of the county of Greene, appointing Polly Byrne guardian of the person and estate of James Byrne, an infant. The facts in the case, as they appeared in the return of the surrogate, were as follows : James Byrne, the father of the infant, married the

daughter of John Bennett, the appellant, in 1842, and died at the house of his father-in-law, in March, 1845, leaving his wife surviving him.  By his will he bequeathed the income of $1500 to his mother for life, and directed the principal of that legacy to be equally divided between his two sisters, after his mother's death.  And the residue of his personal estate he bequeathed to his wife, and to his heir, born after his death; with a limitation over to his mother and sisters in case his wife should die without leaving any heirs by him.  Four days after the death of James Byrne, the infant was born.  And its mother, Abigail Byrne, was sick from that time until her death; which occurred in June of the same year.  She had made her home at her father's, from the time of her marriage until her death; her husband, while living, being engaged in sailing one of the North river steamboats, and being much of his time absent. Shortly before her death she gave her infant child to her father, and requested him to take care of it as his own.  She also enjoined upon him to have it religiously instructed and sent to the sabbath school, and to be careful to preserve its property so that it should not be squandered.  By her will, which was made about a fortnight before her death, she bequeathed to her father, as her executor and trustee, all her interest in the estate of her deceased husband, as his residuary legatee, in trust for the sole benefit of her infant son.  And she directed her executor and trustee to invest the same in such manner as he should deem safe and most productive, and to apply so much of the income thereof as he might deem necessary to the support and education of the infant.  In case the infant should die under twenty-one, she gave one-fourth of her property to her cousin M. B., who at the time of the making of the will was performing the duties of a mother to the infant, and the other three-fourths thereof she gave to the appellant.

The nearest relatives of the infant, after the death of his mother, were his paternal grandmother, Polly Byrne, a widow lady between seventy and eighty years of age, and her two maiden daughters, who lived with their mother, and who during the life of the infant's father had derived their principal support

Bennett *v.* Byrne.

from him; George Byrne, a paternal uncle, who was married and had four small children; John Bennett, the maternal grandfather of the infant, then between fifty-five and sixty years of age; and H. Bennett, the maternal uncle, a bachelor of twenty-five, who resided with his father. The wife of J. Bennett was about fifty-five, and had no children. She was the sister of the infant's maternal grandmother, and had lived in the same family with the mother of the infant for about twenty years, but was not in good health.

About a month after the death of the infant's mother, G. Byrne, the paternal uncle, applied to the surrogate to be appointed guardian of the infant; and notice of the application was directed to be given to the maternal grandfather. The latter appeared and opposed that application; which was finally abandoned. The appellant thereupon asked for the appointment for himself; and the surrogate directed notice to be given to the paternal uncle and grandmother. They both appeared before the surrogate and claimed the appointment. And after hearing of the parties and their proofs, the surrogate denied the application of the appellant, and appointed Polly Byrne, the maternal grandmother, the guardian, upon her executing a bond with sureties in the penalty of $7,000. The surrogate afterwards approved of a bond executed by the guardian and her sureties, without requiring the sureties to justify; although the counsel for the appellant requested to be heard before him in relation to the sufficiency of the bond. And the petition of appeal stated that the sureties were wholly insufficient, and that one of them was not worth the sum of $500, over and above his debts.

*M. T. Reynolds & J. Van Vleck*, for the appellant.

*H. Hogeboom*, for respondents, Polly and George Byrne.

The Chancellor. It was improper to approve of the bond, of the sureties, without requiring them to justify. The return of the surrogate that he knew the sureties to be responsible, amounts to nothing. For I cannot infer, from that, that he

means to return under his oath of office that he knew they were worth $7000 over and above all debts and responsibilities. The proper course for the surrogate, upon the appointment of a guardian, is to ascertain, by the examination of witnesses, the probable amount of the personal estate, and of the income of the realty during the minority of the infant. And when he has done that, he should direct the guardian to give a bond, with sureties, in double that amount; and should require the sureties to justify in at least the amount of the penalty of such bond. In this case there does not appear, by the return, to have been any evidence as to the value of the personal estate, or of the income of the real estate, which came to the infant from his father. The half of the residuary estate of the father, which was bequeathed to the infant by his mother, being by her will placed in the hands of her executor and trustee, could not come to the possession of the guardian, and therefore need not have been included in the bond. But the value of the other personal estate of the infant, with the interest thereof during his minority, and the probable value of the income of his real estate, during the same period, should have been ascertained by the examination of those who were acquainted with the situation and value of the property. And the penalty of the bond, and the justification of the sureties in such bond, should have been regulated accordingly.

The surrogate also erred, in this case, in refusing to appoint the appellant the guardian of the infant, and in committing the guardianship to the grandmother. There are several considerations which should have induced the appointment of the maternal grandfather. In making such an appointment, the true interest of the minor should be consulted, rather than the interests or the wishes of those who are contending for the guardianship. Here the appellant was already the trustee of the infant, to expend the income of the mother's estate in his support and education. And the appointment of any other person as guardian might subject the infant to the expense of separate accounts of the expenditures for his support; the one on the part of the executor and trustee of the mother, who was

charged with the support and education of the infant out of the income of the property bequeathed by her, and the other by the guardian of the estate which came to the infant directly from his father. It would also be likely to lead to collisions between the executor and the guardian, as to what expenditures were necessary and proper for the infant, and as to the manner in which he should be brought up and educated. For each would have a discretion to exercise, upon the subject of necessary ex penditures for those purposes.

Again ; the strongly expressed wish of the mother, upon her death-bed, that the appellant should adopt her orphan child, then about twelve weeks old, and bring it up as his own, and should see that its property was not wasted, was a circumstance which ought to have had a preponderating influence in favor of the appointment of the appellant; other things being equal. The fact that Mrs. Byrne was far advanced in years, was not of itself conclusive against her. For it appeared that she had two maiden daughters, living with her, who could see that the infant was properly cared for. But the probability that if she was appointed the infant's estate would be subjected to the expense of a new appointment within a very few years, and to other incidental expenses necessarily attending a change of guardianship, was a circumstance which was entitled to some weight in favor of the appellant. The fact that George Byrne had four young children who would require the whole attention of his wife, rendered it pretty certain that the infant would be better provided for in the family of the grandmother, or of the maternal grandfather, than in the family of that uncle. Although the present wife of the appellant was not the grandmother of the child, she was not a stranger to it in blood. And the fact that she had resided in the family of her present husband during her sister's life, and that the mother of the infant had been brought up under her care, rendered it highly proba ble that she would feel a strong affection for the orphan child of her deceased niece ; especially as she had no children of her own to draw off her affections from it. I have no doubt, therefore, that the child would be as well attended to in the family

of the appellant as it would be in that of its maternal grand-mother, in her straitened circumstances, if not better.

The surrogate therefore should have granted the application of the appellant, and thus left the child where it had been placed by the request of its dying mother. The orders appealed from must be reversed; and the proceedings must be remitted to the surrogate, with directions to him to appoint the appellant the guardian, of the person and estate of the infant, upon his giving a bond in the usual form, in a penalty of at least double the value of the personal estate of the infant, other than that which came from the mother, including interest thereon during the infant's minority, and the probable income of the real estate during the same period; with two sufficient sureties who can justify in the amount of the penalty of the bond.

The costs of the guardian ad litem of the infant, and the costs of the appellant, upon this appeal and in the proceedings before the surrogate, are to be paid out of the personal estate of the infant which shall come into the appellant's hands as guardian.

And, it being suggested that one of the parties to this appeal has died, since the argument here, the decree to be entered upon this decision is to be entered nunc pro tunc, as of the time when the appeal was heard.