NEW YORK COUNTY.—HON. D. C. CALVIN, SURROGATE.—
July, 1881.

BURMESTER *v.* ORTH.

*In the matter of the application for letters of guardian-
ship of* LORENZ ORTH, *an infant.*

Where the mother, and also a friend of the deceased father, of an infant of
   ten years, entitled to a small estate, petitioned separately for the guard-
   ianship of his person and property, and it appeared that the infant
   had, for three years, resided with, and been cared for by the latter
   petitioner, to whom the father had informally intrusted him; that the
   father had been for several years separated from his wife, for her
   fault; and that she was engaged in a disreputable business, while the
   other petitioner was a suitable person,—*Held,* that the mother's petition
   should be denied, and the other granted.
*It seems,* that the declared wishes of the deceased father of an infant of
   tender years, as to his custody, should, in the absence of a testament-
   ary disposition, have little weight against the lawful claims of the
   mother; who, if a suitable person, and able to maintain and educate
   the infant, is entitled to the guardianship.

APPLICATION for letters of guardianship of an infant's
property and person.

Charles Burmester, on July 10, petitioned for letters
of guardianship of the person and estate of the infant, as
his next friend, setting forth that he had resided with
petitioner for the past three years; that his father was
dead, and his nearest relative was his mother, Mina
Orth; that he was entitled to $1,000, personal property,
and was of the age of ten years. Wilhelmina Orth, the
mother, on July 25, filed a like petition, alleging that
the infant was nine years of age, and that his nearest
relative in New York was petitioner, and that he was
entitled to $1,000, etc.

These two petitions being presented, and charges

being made against the mother, a reference was ordered to take testimony, and the referee filed his report with the testimony, which established, substantially, that the petitioner, Burmester, was a married man, having no living children, and keeping a lager beer saloon; that the infant had resided with him for over three years, its father having died May 9, 1881, after being for several years separated from his wife, the infant's mother; that the father, in his life-time, informally committed the custody and care of the child to the petitioner, who had since cared for him, and sent him to school; that the petitioner and the deceased father of the infant were members of a German organization called "Order Germania," under whose charter the minor in question was entitled to $1,000, on the death of the father.

The infant, being examined without oath before the referee, stated that he had lived with the petitioner over three years, and liked him and his wife, who treated him kindly; and wanted to stay with them, and did not want to go home to his mother, for the reason that she was living with a man, which she did before the death of his father; that he had been to a saloon kept by his mother, in the Bowery, and when he told his father, he refused to allow him to go again; that his mother, in 1880 and 1881, told him that she was living with a man; that he had run away from his mother in the street, one day, because he was afraid she would take him; that his mother told the principal of the school where he attended, that her husband was a bad man, and that Burmester was stealing his property.

It further appeared that the German-American sharpshooting society, of which the father was a member, paid

for his burial, and passed a resolution requesting the Surrogate to appoint Burmester guardian of ·the infant, and declaring he was a competent and upright man, which was established by the testimony of several reputable witnesses ; that the mother of the child was engaged in keeping a concert saloon in the Bowery, the resort of disreputable characters, and where several girls of doubtful reputation served the customers, and that the husband, about the time he separated from her, accused her of going to Philadelphia with a strange man, whom she swindled ; and a witness testified that she had so gone, and on being reproached therefor, answered that it was nobody's business, and that afterwards her husband left her. . The mother, however, testified that she did not keep the concert saloon mentioned, but a lager beer saloon, and that she worked several years ago, with ·the knowledge of her husband, in a concert saloon ; that she was not living with a man, as stated by the minor, and that she did not have women waiters in her saloon ; but she did not deny that she went to Philadelphia with another man, and was gone several days, and that that was the occasion of her husband leaving her ; and the evidence proved that she was engaged in a disreputable business, and kept a disreputable house.

ALFRED STECKLER, *for petitioner Burmester.*

THE SURROGATE.—It is obvious that the mother, being a suitable person, able to maintain and educate her minor child, on the death of the father, is entitled to the guardianship of the minor, for the reason that the law presumes that she has such an affection for, and interest in, her child, as would prompt her to the best

care for its welfare; but that presumption seems to be entirely overcome in this case.

I am aware that to discriminate against a parent, in the appointment of a guardian for a minor, is the exercise of a very delicate and high prerogative on the part of a judicial officer, and yet it is the performance of a very obvious duty, where it is apparent that the welfare of the minor will be thus best subserved.

It is also a most distasteful necessity to find a mother unworthy of the nurture and education of her child; but after a careful consideration of the testimony in this matter, it would, in my opinion, be a most reprehensible disregard of the true interests of this minor to confide his maintenance and culture to such a mother, and to the evil and contaminating influences of her immoral example and vicious surroundings, compared with which, complete orphanage and dependence upon the so-called "cold charities of the world" would seem to be a most welcome deliverance. But in this case, fortunately, the father seems to have appreciated the danger likely to befall his child, and to have intrusted his care to an industrious, worthy, kind-hearted citizen and friend, who seems, thus far, wisely and considerately to have performed the duty and the kindly offices of a worthy guardian, and who has manifested his respect for the wishes of his deceased friend, in sheltering and protecting his helpless offspring, and who now generously offers to assume the legal obligation of guardian, prudently to administer the bounty of a praiseworthy charity, provided by the father for the benefit of his son.

In Bennett v. Byrne (2 *Barb. Ch.*, 216), and Underhill v. Dennis (9 *Paige*, 202), it is held that the declared

wishes of the deceased parents of an infant, in respect to the manner in which he should be brought up, and to whose care he should be committed during his infancy, are entitled to much weight, in deciding upon the claims of the different relatives to the guardianship of the infant ; and while I should pay but little regard to such an expression by the father, as against the lawful claims of the mother, unless the father's wish took the form of a testamentary disposition of the infant, yet in a case where the mother appears to be unfit for the office, I am of the opinion that this court may, with great propriety, give special weight to the expressed wishes and acts of the deceased father, in respect to the custody and support of his infant son, especially as all the evidence shows that the choice of the father was wisely and prudently made.

I am, therefore, of the opinion that the petition for letters of guardianship by Charles Burmester should be granted, and letters issued to him, according to the prayer of his petition, on his giving the usual bond in the sum of $2,000, and that the petition of the mother should be dismissed.

Ordered accordingly.