*(Surrogate's Court, Cattaraugus County.  July 22, 1889.)*

GUARDIAN AND WARD—APPOINTMENT—CHARACTER.

> Where the mother has from girlhood lived a disreputable and licentious life, and had for many years deserted her husband and infant daughter, she will be refused the guardianship of either the person or property of such infant.

Petition for the appointment of a temporary guardian for Mary Meech, a minor under the age of 14 years.

*James Sheldon,* for applicant.　*A. J. Knight,* for respondents.

SPRING, S.　This proceeding was commenced by a petition made by Emory Smith, a cousin of the infant Mary Meech.　Citation was issued and served on the mother, and she appeared and filed a petition with proper bond, and seeks to be appointed herself.　Objections to her appointment are made by four aunts of the child, on the ground that she is an unfit person to be intrusted with the custody and control of the minor, or of her property, and the trial has been directed exclusively to this issue.　A summary of the testimony, which is mainly uncontradicted, is important.　The father, Melvin Meech, died on the 3d day of May last, leaving about $6,000 in real estate and securities, which, by his last will and testament, he devises and bequeaths to this daughter for life, and, upon her decease, to her heirs and next of kin.　The mother is about 27 years of age.　When about 14 she had a child by one Philetus Cook.　She testifies that she was forcibly seduced by Cook while riding in a cutter from Protection, Erie county, to Arcade, Wyoming county,—an improbable story, as the child was born the succeeding June; and, beyond that, the proof shows her intimacy with Cook, even at that tender age, was continuously and notoriously meretricious.　After this, and when this illegitimate child, Jennie, was about 2 years of age, she married Melvin Meech, then about 45 years of age.　She resided with him 5 years, until 1882, and the child Mary was born in 1878.　While she lived with Meech her neighbors testify her reputation for chastity was bad, and she then became acquainted with one of the La Points, the brother of her present husband.　In 1882 she left Meech, taking with her the child Jennie.　She first went to Buffalo, then to Rome, and from there to Canastota, in this state.　Her recital of her trip to Canastota seems incredible.　That a woman would leave her home in Erie county, and aimlessly go directly to Canastota, without any prearrangement, and where she testified she had no friends or acquaintances, is hardly to be credited.　The significant circumstance is that we find her and Charles La Point at work in the same neighborhood.　She remained in Canastota until the following winter, and then, at the suggestion of Charles La Point, she went to Moose River, in Lewis county, in this state, and lived with him there as his wife until two years ago, when they moved to Buffalo, and their adulterous connection continued there until after the death of Meech.　Then, within a few weeks after his decease, and without the semblance of grief at his death, and apparently as soon as these proceedings were known to her, and the necessity dawned upon her of possibly covering up the shame of her meretricious union with the thin cloak of a marriage consummated years after her open adultery with La Point had commenced, she was united in marriage with him.　While living with La Point at Moose River, she took her illegitimate daughter, Jennie, to an orphan asylum at Utica, and the child was subsequently bound out by the managers of that institution to a man named Foster, with whom she still resides.　During her long intimacy with La Point, she never wrote to her daughter Mary Meech; and even when living in Buffalo, a short distance from her, so far as the proof shows, she never exhibited the least affection or anxiety for this motherless child after her separation from Meech.　Not until the possibility presented itself that she might become

v.7 N.Y.S. no.8—17

the custodian of this property was she anxious for the welfare of the child; and it appears to me that this affection is whetted and sharpened by, and derives all its force and vitality from, the property which Melvin Meech never designed to have placed under her management. La Point, her husband, has no property of any amount, but depends for his livelihood upon wages he earns as a day-laborer; and since living in Buffalo he has been, the greater part of the time, in the employ of a veterinary surgeon, and now lives over this establishment, in which sick horses are kept, and to which a livery stable is attached,—assuredly not a desirable place in which to educate and nurture a girl endowed with property sufficient to maintain and educate her in a suitable manner.

So we have in this case the applicant, the mother of the minor, confessedly leading a disreputable life from early girlhood,—one unvarying story of shame. Is she a suitable and proper person to be the custodian of this infant, and to be vested with the management of her property? I am aware that, ordinarily, the parent is first entitled to letters of guardianship; and in this case, the father being dead, the applicant would be entitled. But that right is not an absolute one. The paramount thing to be considered is the welfare of the child; and, with that as the controlling principle of his action, the surrogate is vested with an intelligent discretion as to the person to be intrusted with the custody of the minor and the management of his property. Code, §§ 2821, 2825; *In re Estate of Vandewater*, 10 N. Y. St. Rep. 330; *Griffin* v. *Sarsfield*, 2 Dem. Sur. 4; Field, Guard. & W. § 92; Redf. Pr. 735. And, while courts hesitate before denying this right to a parent, yet, where it unmistakably appears that the interest of the infant will be promoted by the appointment of a person other than such parent, that course will be pursued. *In re Watson*, 10 Abb. N. C. 215; *In re Raborg*, 3 N. Y. St. Rep. 323; *In re Welch*, 74 N. Y. 299; *Burmester* v. *Orth*, 5 Redf. Sur. 259.

Applying these well-settled principles to the case under consideration, I cannot commit the care and tuition of this child to her mother. The child naturally cannot have much affection for the mother, restrained and separated from her uninterruptedly for seven years, and during the whole time not the recipient of a spark of motherly love; and with the mother's history as the confessed paramour of La Point, with a sudden marriage within a few weeks after the death of the father, how could the child regard the mother with any esteem or love? Mrs. Meech exerted herself to sever her relations absolutely from Meech and his family. She assumed the name of La Point. She ignored, not only Meech, but this daughter; and her eagerness now is not for the custody of the child, but for the little patrimony so wisely provided by the father. Her first child—the offspring of her early licentiousness—we find first in an orphan asylum, and next bound out to a stranger. Does this indicate that affection for children which makes their welfare the animating principle in the parent's life? Would this child be liable to be instructed to cherish sacredly her virtue above everything else? Would the life of this erring mother be an inspiring influence for good to this young girl? I fear not. The unbridled license of Mrs. La Point should not be commended by vesting her with the tutelage of this infant. I therefore deny the petition, and decline to appoint her guardian either of the person or property of the minor. The whole proof has been directed to the history of the mother; and, before issuing letters, I wish to make inquiry as to the proper person to be intrusted with the care of the child and the management of her property, and I will take evidence further on Monday, the 29th inst. I will adjust the costs at that time, and findings of fact will be prepared in conformity hereto, and a decree entered denying the petition of the mother, and providing for the appointment of some other person; or that can be arranged by supplemental decree.