## In re LAMB'S ESTATE.

(Surrogate's Court, New York County. December 30, 1912.)

1. GUARDIAN AND WARD (§ 30*)—CONTROL OF CHILD—RELIGIOUS FAITH.

On an application for letters of guardianship of an infant's person and estate by maternal aunts who had, at their own cost, taken care of the infant since the mother's death several years before, the father was entitled to have his request, made in apparent good faith, that the child be brought up in his religious faith, complied with, though he had neglected the child and forfeited his right to any other consideration in the matter of the application.

[Ed. Note.—For other cases, see Guardian and Ward, Cent. Dig. §§ 116–135; Dec. Dig. § 30.*]

2. GUARDIAN AND WARD (§ 8*)—APPOINTMENT OF GUARDIAN—JURISDICTION.

A surrogate's power to appoint guardians of infants is not incidental to a court of probate, but is derived from statute originally Laws 1802, c. 110 (3 Webster, p. 158; 1 Rev. Laws 1813, p. 454, § 30), and since often re-enacted.

[Ed. Note.—For other cases, see Guardian and Ward, Cent. Dig. §§ 9, 13–18; Dec. Dig. § 8.*]

3. GUARDIAN AND WARD (§ 8*)—APPOINTMENT OF GUARDIAN—JURISDICTION.

The power conferred upon the surrogate by Rev. St. 1830 (2 Rev. St [1st Ed.] pt. 2, c. 8, tit. 3, § 6 [now Code Civ. Proc. § 2821]), providing that the surrogate shall have the same power to appoint guardians as the chancellors possessed, ought not to be taken away by mere implications of an inconsiderate or partial character.

[Ed. Note.—For other cases, see Guardian and Ward, Cent. Dig. §§ 9, 13–18; Dec. Dig. § 8.*]

4. GUARDIAN AND WARD (§ 29*)—APPOINTMENT OF GUARDIAN—RIGHT TO APPOINT.

Where, on an application by an infant's maternal aunts for letters of guardianship of the person and of an estate coming from the maternal side, it appeared that the infant had been abandoned by the father to their care several years before, upon the death of the mother, the aunts were entitled to the letters prayed for, subject to a provision which respected the father's wishes that the child be brought up in his religious faith.

[Ed. Note.—For other cases, see Guardian and Ward, Cent. Dig. §§ 109–115; Dec. Dig. § 29.*]

5. GUARDIAN AND WARD (§ 10*)—APPOINTMENT OF GUARDIAN—RIGHT TO APPOINTMENT.

While the surrogate may appoint a guardian other than the parent, it should do so only on a showing that such appointment is for the child's best interest.

[Ed. Note.—For other cases, see Guardian and Ward, Cent. Dig. §§ 23–33; Dec. Dig. § 10.*]

6. COMMON LAW (§ 8*)—DETERMINATION.

Decision as to the common law by the courts of England since American independence have no weight or authority in determining the present common law in New York.

[Ed. Note.—For other cases, see Common Law, Cent. Dig. § 8; Dec. Dig. § 8.*]

Application by maternal aunt for letters of guardianship of the person and estate of Mildred Lamb, minor, opposed by the father. Father not appointed, but his religious faith respected, and application granted, with qualifications.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Isaac W. Goodhue, of New York City, for the maternal aunt of the infant.

Charles C. Marrin, of New York City, for the father, opposed.

FOWLER, S. This is an application by the maternal aunt of the infant for letters of guardianship of the person and estate of an infant under 14 years of age. The facts are not much disputed. Since the death of the infant's mother many years since, the infant, who is a confirmed invalid suffering from an aggravated epilepsy, has lived and been supported solely by the hard earnings of the maternal aunts. The aunts have devoted to it a care and affection very admirable and unusual. Now the child has come into some little estate, and the father, who has never contributed to the support of his child, opposes the aunt's application, and asks to have one of his own nomination appointed guardian of the infant's estate, and that he himself be appointed the guardian of the person of his child. The father is very wisely advised not to seek to be made the guardian of the child's estate, for that would be impossible under the circumstances disclosed to me.

To appoint the father the guardian of the person of the infant and to remove the child from the long accustomed and tender care of its self-sacrificing and devoted maternal aunts would, I am satisfied, be most prejudicial to the delicate and sickly child, and most unfortunate for its physical well-being, happiness, and comfort. The child has never known any care or affection except that of its maternal aunts. To separate a feeble child from such affectionate care would be cruel in the extreme, and should be avoided if possible. To appoint the father guardian of the person would be to give him the control of its person and the expenditure of its little income, either directly or indirectly. This would not be in the child's interest. Nor would it be proper, for it appears that the father has been a most wayward and mistaken young man, dissipating his own patrimony in a very brief time. It also appears that the father's affairs are, or recently have been, greatly disordered, and that his prospects are even now doubtful or unsettled. It was owing to such facts, and others not noticed, but established, that the brief life of the child's mother, as I am informed, was most unhappy and sad. I am of the opinion that, if I have any choice, the father should not be named a guardian of the person of the infant in this matter.

[1] The difficulty with this application and one which distresses me is this: The mother of the infant and her sisters, the infant's aunts, are in religion orthodox Baptists, while the father was born a Catholic, and is, no doubt, now seriously anxious that his only child should be of the faith of his fathers. Yet the father himself consented to be married by a Baptist minister, and was so married. This was not a Catholic observance on his part. It also appears that at some moment, unknown to the maternal aunts, the father had the child baptized in the church of his own youthful faith and upbringing, and thus the child is in name and faith made a Catholic. To me this does not seem so unnatural as it does to the aunts. The mere impulses of

a person who, like the father, belongs by submission, at least, to a great, historic, and disciplined faith, coming down all the ages of our era, are not now the impulses of those of us who are outside of that church. I am bound to conclude that the 'father is most sincere in his contention that the whole future well-being of his child depends solely on its conformity with the Catholic faith. Certainly this is a natural conviction in his case, as his own mother, his family, and all the traditions of his life and race are Catholic. We, none of us, even if not religiously inclined, can cast aside such sacred associations. That the father was sincere in his action in having his child baptized in the Catholic communion is, I think, shown by the fact that at the time he had the child baptized a Catholic it had no prospect of an estate. But if it were otherwise, and if the father simply states to me, as he does, that he has religious scruples, I am bound to assume that he states truly and to give them respect. He is the father, with all the rights the law confers on a father. The court cannot traverse a statement of this kind by a father. There are some statements which admit of no denial in a court of justice, and the father's statement of his religious convictions is one. If a father of any faith, Jew or Gentile, Protestant or Catholic, states in this court that he has religious scruples, there can be no traverse of that statement here. This is a land where all forms of religion are both free and protected, and where the rights of fathers, within the law, are still recognized and enforced in proper cases.

The question before the surrogate is not what form of religion would be most advantageous for the child, but what are the rights of the parties to care for her estate and temporal custody. The surrogate is the servant of the law, and he can have no right to obtrude his individual opinion on matters of faith on the parties who resort to this court for assistance in cases they are pleased to submit to the surrogate.

[2] The express jurisdiction of the surrogate to appoint guardians of infants is in this state over a century old. His authority to appoint guardians, though undoubtedly claimed by the Prerogative Courts of New York and its surrogates before that time, is not, I think, a jurisdiction incidental to a court of probate, but one devolving on the present surrogates by a particular statute (Laws of 1802, c. 110, 3 Webster, 158; 1 R. L. 454, § 30), often re-enacted and acquiesced in by the public authority of the state of New York. I have indicated the source of this particular jurisdiction of the surrogate in my prior opinion in the Matter of the Infant Wagner, 75 Misc. Rep. 419, 425, 135 N. Y. Supp. 678, and also what I conceive to be the true limitations imposed on the exercise of the jurisdiction itself. In the jurisprudence of the common law, imposed by organic action on the present state, in strict conformity with the prior law in New York, we find after the year 1696 a new kind of guardianship, known as a "chancery guardian." This species of guardianship owed its rise to the modifications made necessary in the common law after the abolition of feudal tenures and the disappearance of certain kinds of common-law guardianship. Matter of Scoville, 72 Misc. Rep. 310, 313, 131 N. Y. Supp. 205. The cessation of the feudal relations in the common-law

courts disorganized all prior forms of guardianship. After the institution of the new kind of "chancery guardian" in 1696, the mode of selecting such guardians and the rules regulating their appointment in disputed cases became extremely complete in courts of chancery prior to our Revised Statutes of 1830. The chancery reports are full of adjudications in point.

[3] It was for this reason and because of prior acts of this state to like effect, and in order to set at rest other debatable questions, that the Revised Statutes of 1830 prescribed that the surrogate should have the same power to allow and appoint guardians which the chancellors of this state possessed. 2 R. S. 151, § 6, now section 2821, Code of Civil Procedure.

That the statute of this state conferring power on the surrogate to designate and appoint guardians of the person and estate of infants meant precisely what it said I have no doubt; nor had that distinguished surrogate of this county, Mr. Rollins. Derickson v. Derickson, 4 Dem. Sur. 295. The canon of equity in respect of the designation or selection and appointment of guardians was very complete in the year 1830, when the Revised Statutes took effect, and it was intended that the surrogate, in the selection and appointment of guardians, should be bound by that canon. It is sometimes the fashion to depreciate the jurisdiction of the courts of the surrogates, without, I think, taking proper note of the fact that never in the history of the common law has another court of probate been invested with such an extensive, historic, and splendid jurisdiction. The court of the surrogate is, in the first place, an original court for all contentious probates. In contentious probates the Appellate Division is, however, by law the ordinary, and the surrogate, as his title implies, is in reality only the delegate in conformity with very old practice in probate courts. Matter of Will of Irving, 138 N. Y. Supp. 784, App. Div. 1st Department, Decisions, 1912. The surrogate also has jurisdiction to settle and distribute estates of the dead in the manner formerly cognizable only in the courts Christian and the Court of Chancery combined. It now may sit, when duly invoked, also as an original court of construction of wills and devises, and then its jurisdiction is nearly as complete as the quondam chancellor's. In addition to all this, it is the chief, or one of the chief, assessors of the state. It also appoints guardians in the same manner as did the chancellor. Those who underestimate such an extended and complex jurisdiction are apt to have little acquaintance with the history of jurisdictions at common law. The trouble in this court is not with the jurisdiction of the surrogates, but to be equal to the jurisdiction imposed and to apply and exhaust it in conformity with the great body of law governing it. This law is as binding on the courts of appeal as on the surrogates. There is no authority in any appellate court to apply a different kind of law excogitated out of different sources of law. The established law which governs the surrogate must be applied in every other court of the state whenever the surrogate's judgments and jurisdiction are open to review. As matter of course, and as has always been the case with courts of this character, if a surrogate usurp jurisdiction, he should be and is rebuked and checked. But the power clearly conferred on the surro-

gate ought not to be taken away by mere implications of an inconsiderate or partial character. The interests of the public are greatly dependent on the jurisdiction in question, and that is the paramount consideration.

The statute regulating guardians reads that the surrogate has the like power and authority to appoint a general guardian of the person or the property, or both, of an infant which the chancellor had when his great office was abolished in the year 1846. Section 2821, Code Civ. Proc. I take it so plain a statement is not open to equivocation, and that the surrogate is to be controlled by the equitable canon which controlled the chancellor under like circumstances. Matter of Wagner, 75 Misc. Rep. 426, 135 N. Y. Supp. 678.

[4] That the surrogate may in a proper case appoint other than the parent the guardian of the person or estate of an infant is no longer open to contention. Woerner, American Law of Guardianship, 90; Matter of Wagner, 75 Misc. Rep. 427, 135 N. Y. Supp. 678, and cases there cited. While courts of law have no power to take the custody of an infant away from the father, it is different with the surrogate under the statute cited. Besides, this infant is not in the father's custody. He long since abandoned its custody to its aunt. It is already in the custody of the aunt by consent of the father.

[5] Having distinct reference to the power of the chancellor, the surrogate may in any event, in a proper case, appoint a guardian of the person or property of the infant other than the father. Sections 1341, 1342, Story, Eq. Jurisp. and cases there cited; Derickson v. Derickson, 4 Dem. Sur. 295. While this is true, the power to appoint other than a parent the guardian of the person of a child should be very sparingly exercised (Morehouse v. Cook, Hopk. Ch. 226; Ledwith v. Ledwith, 1 Dem. Sur. 154), and then only on a proper showing in the best interests of the child itself (Matter of Wagner, 75 Misc. Rep. 426, 135 N. Y. Supp. 678, and cases there cited).

By the law of this state, it is the father, and not the aunts, who has the right to determine the religious belief of an infant under 14 years of age. Matter of McConnon Infants, 60 Misc. Rep. 22, 112 N. Y. Supp. 590; Matter of Crickard, 52 Misc. Rep. 63, 102 N. Y. Supp. 440; Matter of Jacquet, 40 Misc. Rep. 578, 82 N. Y. Supp. 986, citing Matter of De Marcelin, 4 Redf. Sur. 299, affirmed 24 Hun, 207. The same conclusion is now reached in England, even where there is a settled state religion. In re Scanlan Infants, L. R. 40 Ch. Div. 200, 213; Eversley's Law of Domestic Relations (2d Ed.) 523. The modern English law even goes so far as to hold that the father cannot alienate this right, and, even if he contract by an antenuptial agreement to bring the children of the marriage up in the mother's faith, the modern English law enables him to revoke the consent. I am free to say that the conclusion of the modern English courts on this point does not appeal to me. Of course, such a rule could not be the law of this state. It is the ancient decisions of England, rendered on the primitive common law of England, while in political control of New York, that form an integral part of our common law.

[6] Since our independence, decisions of English courts have no

weight or authority here. It is a juridical assumption, also, that we are our own sole interpreters of the ancient common law once applicable here. These are tremendous differences, and thus it is that the common law of the people of this state and that of the people of modern England are often very far apart in principle and in application. As the Romans looked upon themselves, and not modern Greece, as the true successors of ancient Greek thought, so our courts are obliged to assume that they, and not the English courts, are the true interpreters of the great principles of the nonstatute law once common to all English-speaking peoples, some few dependencies excepted. This assumption is a necessary corollary of sovereignty.

The father even yet, in contemplation of our common law, is priest and king in his own household. 1 Bla. Com. 453. Even if he is an unworthy father, he is not ipso facto dethroned, and he retains a right to regulate the religious welfare of his own infant. Matter of Crickard, 52 Misc. Rep. 66, 102 N. Y. Supp. 440. I am, I think, obliged by law to defer to the expression of the father's wish for the religious training of his infant child.

As the estate of the infant was derived wholly from its mother's side, I shall in this instance defer to that very old maxim of our common law, "materna maternis, paterna paternis," as it is still discernible in the statutes regulating descents and successions ab intestato in this state. I nominate and appoint the infant's maternal aunt, this petitioner, Florence R. Cooper, the sole guardian of the estate of the infant. The estate came from the mother's side, and in this instance there it should stay for the present. I nominate and appoint the aunt also a joint guardian of the person of the infant, together with Mrs. Clara Stone Marshall, of No. 3120 Broadway, New York City, a lady in religion of the Catholic faith. This lady is of my own selection. So kindly and gentle a person will be sure to represent the father's faith in a proper way without detriment to the child's health. If the guardians of the person cannot agree, and I feel assured that two such excellent women can agree even in so delicate a matter, either may have liberty to apply to the surrogate from time to time on notice to the other during their joint guardianship, and he will then direct them further in the premises.

Decree accordingly.