(89 Misc. Rep. 83)

## IN RE MANCINI.

(Surrogate's Court, New York County. January 20, 1915.)

GUARDIAN AND WARD (§ 13*)—GUARDIAN OF PERSON OF INFANT—RIGHTS OF INFANT.

Where a Catholic orphan was placed by an elder married sister in the care of a Protestant, who supported the child and was competent to care for her, the court, in appointing a guardian of the person of the child, must consider her religious status; and where her eldest brother asked for his appointment as guardian, while the child, who had attained the age of 14 years, petitioned the court to appoint the Protestant, the court will appoint the Protestant, on condition that he will place the child in a Catholic residential educational institution, and thereby satisfy the child's family; otherwise, the brother will be appointed.

[Ed. Note.—For other cases, see Guardian and Ward, Cent. Dig. §§ 40–52; Dec. Dig. § 13.*]

Proceedings for the appointment of a guardian of the person of Adriana Mancini, a minor. Order for appointment directed.

Philip E. Reville, of New York City, for petitioner.
Leonard McGee, of New York City (Alice Dillingham, of New York City, of counsel), for Adriana Mancini and other respondents.

FOWLER, S. Since the petition of the adult brother was filed for his appointment as the guardian of the person of his sister, Adriana Mancini, the infant before me has reached the fourteenth year of her age and opposes the appointment of her brother, who is really the head of her family and in loco parentis toward the infant. This relation of headship the petitioning brother has successfully maintained toward others of his family, and he seems to have been successful in keeping the family together. The counter petition of the infant asks for the appointment of Antonio A. Arrighi, and not her elder brother.

It appears that the infant was placed by an elder married sister, now absent in Italy, in the care of Rev. Antonio A. Arrighi, an Italian minister of a Protestant denomination. It would seem that, at the time the infant was so intrusted to Mr. Arrighi, there was some sort of pledge by the reverend gentleman in regard to the religious upbringing of the infant in the Catholic faith of her father and family. It appears that this pledge has not been scrupulously maintained, as the little girl was placed by Mr. Arrighi at his own expense in a home under marked Presbyterian influence, and while there she is constantly taken to the Presbyterian Church on Sunday by the excellent matron of the institution. Of course, this conduct, however well meant, is incompatible with the

discipline of the Catholic Church, and it is regarded by the infant's family as a breach of the compact before mentioned.

But on the inquiry before me Mr. and Mrs. Arrighi rejected any implication of a design to proselytize, and they attribute the nonconformity of the religious action stated with their pledge to the accident of the child's environment. It is apparent to me that Mr. and Mrs. Arrighi have looked very well after the physical and material comfort of the child, and they certainly are more capable of bringing the child up in comfort than are her relations and the petitioning brother. Mr. Arrighi expresses his willingness to give the child free access to the religious rites and ceremonies of her faith. This is all very well; but I doubt whether, if the child remains where she now is, it would be in fact a genuine execution of the compact mentioned.

The child's obvious desire—and I examined her myself while she was on the witness stand—is to remain with Mr. and Mrs. Arrighi, who removed her from discomfort and want to greater physical comfort and brighter and more affluent surroundings. I feel that in so far as is consistent with the law I should not overlook the child's own wishes. But I will not forget that the religious status of the child before me is that of a Catholic child, and I think the law governing the action of the courts, under such circumstances as those now disclosed to me, is fairly well determined. In the year 1912, in Matter of Wagner, 75 Misc. Rep. 419, 135 N. Y. Supp. 678, and in Matter of Lamb, 139 N. Y. Supp. 685, I had occasion to apply these principles, in so far as I was then able, and I had some satisfaction in observing that my solution proved ultimately satisfactory to all the conflicting parties. Yet in no other litigations with which I am familiar are the contending parties animated by so much animosity and deep-seated feeling as in those involving the religious faith of infants and their proper custody with reference to the preservation of such faith.

The surrogate's power to appoint guardians of the person of infants is now statutory, and declared coextensive with the power of the chancellor of this state on December 31, 1846. Matter of Wagner, 75 Misc. Rep. at page 425, 135 N. Y. Supp. 678. I have, since coming here, always regarded this as the most weighty of my jurisdictional powers, and I have not neglected it. The canons on which the chancellors of this state proceeded in 1846 are fairly well settled. In fact, those canons were almost closed with the chancellorship of Lord Eldon, as our own chancellors recognized in practice. The chancellors always recognized in the selection of guardians the paramount claims of the family of the infant, especially those of the father and the mother.

In this instance now here the child is an orphan, but I am not inclined for that reason to overlook the desires and interest of the child's eldest brother, who stands in loco parentis to her. The claims of the eldest male of a family are recognized in all systems of law. Co. on Litt. 88a. He is, as I am assured by my own inquiry in this proceeding, a respectable and laborious man of deep religious faith. He is, besides, a man of family who has taken care, in addition to his own family, of a minor brother and sister in their youth, thus preserving the family status and tradition of his father's family. This conduct, I think, all

well ordered states encourage and promote. In other systems of law, and to some extent in our own, family compacts are greatly regarded by courts of justice in matters of this kind. The surrogate may doubtless appoint other than the child's parents her guardian in a proper case (cases cited in Matter of Wagner, 75 Misc. Rep. 427, 135 N. Y. Supp. 678), and this is a fortiori so in the case of the child's eldest brother, standing in loco parentis.

The guardian, as Lord Hardwicke said, is the proper judge at what school or institution the ward shall be placed. Hall v. Hall, 3 Atk. 721. For this reason only the selection of a guardian would become of great importance at this time to this child now before me.

If I should disregard the wishes of the child herself, and appoint her eldest brother her guardian, he would doubtless select a school where the religious faith of the child would be carefully attended. In matters of education, and equally so with Jews and Gentiles, Protestant and Catholic, the wishes of the infant's family are to be respected by the court. Each particular faith has more or less deep-seated notions and tenets about education which go to the whole future life and conduct of the child. To Catholics, in particular, the education of an infant, leading as it does to their indissolvable marriage law, and their family relations founded on a subordination and respect to elders, the education of their infants in their own way is regarded by them as of paramount importance. It is evident that the preference of a Catholic family in regard to the education of a Catholic child cannot be overlooked by the court in the selection of a guardian for a Catholic child.

Another reason impels me. By the family law of this state, as I showed indirectly in a recent case before me (In re Connolly, 150 N. Y. Supp. 559), the obligations of a family to support, maintain, and nurture their own members naturally confer reciprocal rights, either consultative or actual, in respect of the education and future well being of the infant members of the family. If the family are bounden, either morally or legally, to such obligations, their wishes in such a case as this are entitled to respect by the surrogate.

But on a question where the child shall reside, her own desires, at her present age of 14, are not to be disregarded in the selection of guardians, and, indeed, such desires possess great weight in courts of justice when there is no imputation against the person she selects. In re Oakaver, 2 Ves. 374. Now, the family of the infant have left her for some 5 years with Mr. Arrighi, who through all this period has solely maintained and supported her. The infant now seeks Mr. Arrighi's appointment as the guardian of her person. If I do not appoint him, I shall not only disappoint the infant, but he will withdraw his support and maintenance, and in that event the brother is in no condition to supply the deficiency. But I cannot appoint Mr. Arrighi, unless on condition that he is willing to place the child in a Catholic residential educational institution, which I understand will satisfy the infant's family and not estrange them from her.

If Mr. Arrighi will accept our letters on that one condition, they will issue to him; but, if not, then the petitioning brother of the infant will be appointed the guardian of the infant's person.