THE PEOPLE OF THE STATE OF NEW YORK ex rel. PETER RICH, Also Known as PIETRO RICCI, Relator, *v.* MARY ELIZABETH LACKEY and Another, Respondents.

Supreme Court, New York County, August 1, 1930.

*Carl Sherman* and *Edward G. Griffin*, for the relator.

*Nash Rockwood* and *Boardman Wright*, for the respondents.

VALENTE, J. Relator, the father of two children, Ruggiero Ricci and Giorgio Ricci, also known as Roger Rich and George Rich, has procured a writ of habeas corpus for the purpose of obtaining their custody from the respondents who, it is alleged, are

detaining them illegally. Roger is nine and George seven years of age, and both have been in the custody of the respondent Lackey since 1927 and 1928 respectively. Respondent Robb supervises the household in which Miss Lackey maintains them and acts as the house mother.

The circumstances under which Miss Lackey obtained the custody of the children are as follows: In July, 1926, the father of the children, who was then living in San Bruno, Cal., brought Roger to Louis Persinger, a famous violin teacher in San Francisco, requesting that he give him violin instruction. Mr. Persinger turned him over to his assistant, Miss Lackey, a graduate of the University of California, who found him of such unusual promise that she gave him two lessons a week without charge, Roger visiting her at her home in Berkeley twice a week. This was continued until 1927, when it was suggested that he would make better progress if he should come to live with Miss Lackey. The family was rather impecunious, there being seven children, and the parents entered heartily into the proposition and also suggested that George, the younger brother, receive similar instruction and care. In May, 1927, a contract was entered into, signed by Miss Lackey and by the parents, by the terms of which they relinquished custody of Roger until he was twenty-one years of age, with a provision that his earnings should be equally divided between the parents and Miss Lackey, she to take care of the cost of maintenance, clothing, physicians' charges, and to supervise his musical education.

In March, 1928, a new agreement along similar lines was drawn up between the parties, and a similar agreement covering an arrangement with reference to George. In February, 1928, Mr. Persinger began to give Roger lessons in addition to the daily instruction given by the respondent Lackey. In the interim he had made very substantial progress and had won the Oscar Weil Memorial scholarship in competition with twenty-two other students much older than himself. In April, 1928, Mr. and Mrs. Frederick M. Bartlett of Chicago, wealthy music lovers, began to take an interest in the musical education of the children and to give material aid toward the expenses of their maintenance and education. In October, 1928, Roger appeared as a soloist at a public recital in San Francisco and created a musical sensation, the critics predicting that he would be the world's greatest violinist. Soon thereafter, Miss Lackey was appointed general guardian of the infants by the courts of California and she obtained permission of the court for the removal of the children to New York, on the ground that Mr. Persinger's removal to that city made it necessary to do so, so as to give them the benefits of his continued attention. In October, 1929, Roger

made an appearance in public as a soloist at a concert of the Manhattan Symphony Orchestra, and was again acclaimed by the press in the leading newspapers of the United States.

In the early part of 1930, for some reason not satisfactorily explained, the Bartletts withdrew their financial support. It seems that they were satisfied to continue such assistance if the children were taken from the guardianship of Miss Lackey. Thereupon, about March, 1930, the parents made an application for the revocation of the letters of guardianship granted by the Superior Court of California, on the ground that fraud had been practiced in obtaining them, and on the further ground that they had been granted without notice to the parents. The application was denied, and the determination of the court affirmed by the higher tribunal on appeal. While the appeal was pending, this writ of habeas corpus was procured, the purpose of which was to grant the father custody of the children.

Upon the hearing a large amount of testimony was elicited. It appeared that the Bartletts were willing to give material aid to the children and to grant generous subsidies to the parents so as to make them financially independent. Miss Lackey presented proof of similar offers of financial assistance to her by a wealthy art patron, together with material financial assistance to the children.

While the testimony deals very largely with the welfare and the musical progress of the older child, I shall consider the disposition of the application as to him conclusive as to the application with regard to the younger child, as I believe that in the best interests of the children they should not be separated, and the disposition in one case should govern that in the other.

A preliminary objection has been made by the respondents to the effect that since Miss Lackey's application for guardianship is pending before the Surrogate's Court, the Supreme Court should not intervene. In the matter of the determination of custody, this court has sole jurisdiction. It is true that in the matter of the appointment of a guardian the Surrogate's Court has concurrent jurisdiction, and the seemly administration of the law demands that orders of the two courts on such matters do not conflict. (*Matter of Lee*, 220 N. Y. 532, 539.) But as is also said in the last cited case (at p. 539): " Guardianship of the person does not always, under all conditions, give absolute right to the custody * * * of the child, even from its general guardian. (*Wilcox* v. *Wilcox*, 14 N. Y. 575; *Matter of Knowack*, 158 N. Y. 482, 490; *Matter of White*, 40 App. Div. 165, 168; *Losey* v. *Stanley*, 147 N. Y. 560.) The right of the general guardian is the same as that of the father, and must submit to the same regulation and control. (*Matter of Welch*,

74 N. Y. 299; *People ex rel. Pruyne* v. *Walts*, 122 N. Y. 238; *People ex rel. Johnson* v. *Erbert*, 17 Abb. Pr. 395; *Matter of Wentz*, 9 Misc. Rep. 240; *Jenkins* v. *Clark*, 71 Iowa, 552.)"

It follows, on the one hand, that the rights of the parents as natural guardians to the custody of a child may be interfered with by the court, in the interest of the child's welfare, and custody disposed of otherwise; or, on the other hand, the court may deprive the judicially appointed guardian, even though he may be without fault and even though the interests of the child are well served in his custody, and restore it to its parents as a recognition of their superior rights, where such parents are proper persons and have not been otherwise delinquent in the prior exercise of their parental duties.

Let us now analyze the legal basis for the claim of Miss Lackey to the custody of the children. First come the agreements of March, 1928, whereby the parents yielded to her complete custody until the children were to attain the age of twenty-one. Regardless of the good faith of the parties in entering into such a contract, an agreement by which parents yield control of their children during the period of minority, is not specifically enforcible. It has been so held in *Gordon* v. *Wyness* (169 App. Div. 659) where the court said that equity would not enforce such an agreement by specific performance, " for the father had the right to take his child away and give it his parental bringing [up according to his own judgment." On the other hand, his removal of the children will be deemed a breach of the contract, for which the other party, having entered upon its performance in good faith, will be entitled to compensation to the extent of the reasonable value of the services. As is said by Mr. Justice CARR in the last cited case: " He [the father] could not farm out his child in the meantime and have it receive the care and attention of others without being liable for the reasonable value of such services, if he broke his agreement."

The parties themselves recognized the uncertainty of such a custodianship agreement by providing for the judicial appointment of Miss Lackey as the general guardian of the infants, both parents executing a relinquishment and consent before the Superior Court of California.

Respondents point to *Middleworth* v. *Ordway* (191 N. Y. 404) as sustaining the proposition that such a contract of custodianship is absolutely binding, citing the language of Judge VANN to the effect that "A father unable to provide for his infant child, may transfer the custody, control and the right to the services thereof to another, subject to the right of a court of equity to interfere in the interest of the child."

But that case dealt with a situation in which the contract had been completely executed on both sides, the custodian having died, and the question arising whether the child could enforce the right of inheritance from him — a right which had been granted to it under the contract sought to be held illegal. The court held the agreement legal, and sustained the child's claim, notwithstanding the fact that she had not been legally adopted. Obviously this case does not stand for the proposition that an executory agreement by which parents give custody of their child to another, may not be terminated by the parents, upon terms of compensation that may be just, even though the interests of the child might be equally well served by continuing the custodianship. Nor does the case of *People ex rel. Brush* v. *Brown* (35 Hun, 324) sustain respondent's views. There the father had given his child to relatives under a written agreement not to take it away. Upon a visit by the child to the father, the latter refused to allow it to return to the relatives. A writ of habeas corpus by the latter was dismissed. The order was reversed, solely on the ground that the court below had refused to receive evidence tending to show that the father's second wife was an improper person to have charge of the child. It is evident that the court did not assert the paramount contractual right of the relatives, but merely held that the fitness of the home which he maintained was a proper subject of inquiry. *Lind* v. *Sullestadt* (21 Hun, 364) did not involve any questions between the parent and the custodian. There the infant attempted to recover for his services to the custodian upon a *quantum meruit* basis. The case was decided on a question of fact whether the defendant had treated the infant in a suitable manner as a member of the family, the charge to the jury being that if he had not furnished the child with proper schooling, clothes and food, he had violated his contract with the parent. Again it is patent that the case is of no assistance to respondents.

It follows, therefore, that if the claim of the respondents were predicated on the contract alone, the court, having in mind the uncontroverted evidence of the present fitness and capability of the parents to maintain the children in the manner in which they have been accustomed, would be constrained to award custody to the parents.

But respondents rest their right upon a stronger argument — the appointment of Miss Lackey by the courts of California as guardian of the person and property of the children. To this the petitioner retorts that the appointment has no extraterritorial effect, and points to the fact that respondent Lackey herself has recognized this by applying for guardianship to the Surrogate's Court of New York.

It is quite true, as relator points out in a citation from *Woodworth* v. *Spring* (86 Mass. 321), that a foreign guardian cannot assert his power *de jure* outside of the territorial jurisdiction. This applies with particular force to a foreign guardian of the property, whose control over the funds of his ward in the State is subject to regulation and approval by the laws of this State, and usually necessitates an ancillary guardianship. The obvious reason is that the possible claims of the State and domestic creditors must be protected. There is particular reason for the application for a guardianship in the Surrogate's Court, as certain funds belonging to one of the infants are on deposit here. But even in the matter of guardianship of the person, *de jure* guardianship does not *ipso facto* confer guardianship here. Relator cites from the Massachusetts authority as follows: "The *patria potestas* of a foreign parent over his child is not that vested in him by the laws of the place of his domicil, but that which exists by virtue of the parental relation in the country where the father seeks to enforce his authority. * * *

" Nor, for like reasons, can a guardian appointed by virtue of the statutes of another state exercise any authority here over the person or the property of his ward. His rights and powers are strictly local, and circumscribed by the jurisdiction of the government which clothed him with the office."

Continuing his argument based upon this expression, relator argues that, as he is a resident of New York now and Miss Lackey also claims residence here, she is in the position of a stranger setting up a claim adverse to natural guardians resident of New York. On the other hand, it is only fair to add the observations in *Woodworth* v. *Spring* (*supra*) to the following effect: " But it by no means follows that his [the foreign guardian's] claim to the care of the child and the control of his person, and to the privilege of removing him from this commonwealth, is to be absolutely denied. On the contrary, it is the duty of the courts of this state, in the exercise of that comity which recognizes the laws of other states when they are consistent with and in harmony with our own, to consider the *status* of guardian which the petitioner holds under the laws of another state as an important element in determining with whom the custody of the child is to continue. It would not do to say that a foreign guardian has no claim to the care or control of the person of his ward in this commonwealth. If such were the rule, a child domiciled out of the state, who was sent hither for purposes of education, or came within the state by stealth, or was brought here by force or fraud, might be emancipated from the control of his rightful guardian, duly appointed in the place of his domicile, and thus escape or be taken out of all legitimate care and custody.

But in such cases the foreign guardian would not be regarded here as a stranger or intruder. His appointment in another state as guardian of an infant, with powers and duties similar to those which are by our laws vested in guardians over the persons of their wards, would entitle him to ask that the comity of friendly states having similar laws and usages should be so far recognized and exerted as to surrender to him the infant, so that he might be again restored to his full rights and powers over him, by removing him to the place of his domicile. And if it should appear that such surrender and restoration would not debar the infant from any personal rights or privileges to which he might be entitled under our laws, and would be conducive to his welfare and promote his interests, it would be the duty of the court to award to the foreign guardian the custody of the person. This is the doctrine substantially stated by Lord LANGDALE in *Johnstone* v. *Beattie*, 10 Cl. & Fin. 42, 113, 145, and confirmed in a subsequent judgment in the case of *Stuart* v. *Moore*, in the House of Lords, as reported in 4 Law Times (N. S.), 382."

The question of the right of Miss Lackey to the guardianship of the infants may, for reasons indicated, proceed before the Surrogate's Court without interference with the determination upon habeas corpus as to the relative claims of custody. The latter question may be examined anew, notwithstanding the contention of the respondents that the determination of the courts of California is *res adjudicata* on the question. An examination of the record in California shows that the question there presented was, whether the guardian had been appointed as a result of fraud. The application by the parents was to revoke the letters, on the ground that they had been obtained without notice to the parents and by fraud, and that the court had no jurisdiction to grant guardianship. This question was decided adversely to the petitioners and this determination was affirmed on appeal in the Court of Appeals of California. On these points, the determination is *res adjudicata*, and perhaps it is also *res adjudicata* as to the fitness of Miss Lackey to continue under the powers granted by the California courts. It does not, however, bar the establishment of the possible superior right of the parents to custody. It is unfortunate for them that they did not present this question squarely by habeas corpus in that jurisdiction, instead of making an unwarranted attack upon the conduct of a young woman to whom they should have been deeply grateful for what she had done for their children. If they had invoked the proper remedy, the proceedings in this court might have been unnecessary, because the order of the foreign court

would then have become *res adjudicata* upon the facts there presented. (*Matter of Standish*, 197 App. Div. 176.) There the court held that the determination of a court having jurisdiction in habeas corpus proceedings, awarding the custody of a child, is *res judicata* in subsequent similar proceedings between the same parties in another state in the absence of evidence of changed conditions.

That case, cited with great emphasis by the respondents, does not establish the proposition for which they contend, because the proceedings in California did not involve the relative rights to custody but only the question of continued legal guardianship. It is interesting to observe that the case also stands for the proposition that habeas corpus proceedings will lie to take a child from its legally appointed general guardian, since the court in such proceedings is not guided solely by the question of legal custody, but can exercise equity powers and make a decision dependent on the grounds of expediency, equity and the interests of the child.

While the fitness of Miss Lackey is not in question, the case under its peculiar circumstances involves the relative fitness of the parents on the one hand, and Miss Lackey on the other, with preference to be given to the parents — other factors being equal. It becomes important, however, to consider two charges made by the parents which reflect upon the immediate conduct of the respondents and upon their right even to temporary custodianship. One charge brought is, that no steps have been taken to rear the children in the Roman Catholic faith, which is the one professed by their parents. Any omission on Miss Lackey's part in this direction, I am satisfied, was not willful. When her attention was called to the matter of the religious education of the children, she promptly took steps to respond to the just desires of the parents.

The other point raised, however, has given me serious concern, and that is, the charge of possible exploitation of the children by the arrangement of an unduly large number of public appearances, to the detriment of the health and the welfare of the children and from motives of possible profit. No reflection can be cast upon the excellent way in which the musical education of the children has been conducted up to now. They have received the benefit of personal instruction from Mr. Persinger, one of the most noted teachers of music in the country, who is also responsible for the bringing out of the other celebrated youthful violinist, Yehudi Menuhin, who is now somewhat older than Roger. The public concerts hitherto given by Roger have not taxed his strength and have served to give him a nation-wide reputation. There may be some misgiving, however, about a program of ten concerts between October 3 and December 9, 1930, and witnesses for the relator

point to the baneful effect of a similar program upon the childhood career of Josef Hofmann, the celebrated pianist.

No such prodigious task confronts him as the one imposed upon Hofmann, who, while touring America, gave fifty public concerts in two and a half months. (Grove, Dictionary of Music and Musicians, vol. II, p. 417 [Presser ed. 1922].) This inhuman exploitation caused great indignation and ended in the Society for the Prevention of Cruelty to Children taking the matter up and preventing further appearances. His health broke down under the strain and caused him to withdraw from public recitals for six years. It is quite the accepted view among musicians that this enforced rest not only benefited his health, but promoted his development to artistic maturity. Physicians have testified that public appearances are not detrimental to Roger's health. Offhand it would not seem that a concert appearance on the average of once a week would be a great task, provided this rate were not continued for the balance of the musical season.

But there is another important consideration to be taken into account — the effect of his continued appearances upon his future musical progress. This is a subject upon which, as a layman, I am hardly in a position to speak authoritatively, except from the meager testimony offered before me and the examples from musical history. It is a subject on which even educational psychology has little more than empirical notions. Public appearances are a part of the artistic education of the talented child, and the entertainment and inspiration of the audiences are a secondary consideration. The fact that they are also a source of profit to the child and those in charge of him is no objection, except to the extent that it may become a temptation to exploit him by increasing the number of concerts beyond his physical capacity and the demands of his musical education.

Public appearances furnish to the youthful artist an index of and incentive to self-improvement, such as performances before his teacher or in the circle of his friends cannot adequately provide. Without such occasion, his talent is stifled for want of opportunity for self-expression. But such performances — apart from the tax upon the artist — may well exceed reasonable bounds, and prove a detriment to his progress. Educators have frequently called attention to the danger of arrested development of children whose talents are forced beyond their gradual unfolding. Perhaps this is one reason why so many infant prodigies, at maturity, disappoint early expectations. Musical prodigies are no exception. In the case of a first-class genius who has attained technical perfection at such an early age, the result may be different. There is little need

for him to grow in that direction. On the other hand, may not a career of concert giving extended over a period of years produce a loss of freshness and spontaneity in the young artist? He may become jaded with continued adulation, and sigh, like Alexander, because there are no more worlds for him to conquer. Besides, devotion of a large amount of his time to public performances may seriously interfere with his culture, both general and musical, and deprive him of the time to hear other great players in order to profit by their artistic interpretations. And what about the effect on the musical public? It is by no means impossible that it may become surfeited with a prolonged feast of musical virtuosity. The marvels of the child's performances may become commonplace, and he may cease in the public mind to be a seven-day wonder. If, again, culture and musical development should be made secondary to public exhibition, the child, even though it retained public curiosity and interest, might cease to attract upon reaching the period of late adolescence. A public, tremendously interested in witnessing a child produce magical effects on the violin, might cease to wonder at the same performance by the adult.

An interesting illustration of this is found in the experience of Mozart himself. As a child he gave numerous public concerts before distinguished audiences, including the crowned heads of Europe. His genius was widely acclaimed. At the age of fourteen the Pope made him a knight of the Golden Spur, a distinction previously given to the mature composer, Gluck. He continued his concert career through both childhood and adolescence. But on reaching early manhood, he found that those who had been interested in the marvelous playing of the boy wonder, had lost their interest in the performance of the young man who had grown up in his place. His early career might, by some, be regarded as a conspicuous exception to the rule that over-exploitation of the artist in childhood, if he has the physical endurance, is not detrimental to the development of his maturity since Mozart retained his genius throughout his life, although his ardent devotion to composition during his mature life kept him from pursuing what might have seemed to him the inferior career of a performer as distinguished from his chosen work as a composer. On the other hand, during his many years of public exhibition in his childhood he assiduously devoted himself to composition. His constant efforts at self-expression undoubtedly enabled him to preserve the freshness and vigor of his musical activity and were a constant stimulus to new effort, the results of which were so frequently tested by the playing of his own works, as distinguished from confining his efforts to the reproduction of the works of others. The

experience of Mendelsohn is similar. His public playing as a child was incidental to, and accompanied his continued work upon artistic creations of his own. At the age of seventeen, he produced what is by many considered his greatest composition, the overture to "A Midsummer's Night's Dream."

There is no evidence that our child artist has as yet powers in that direction, and, therefore, the exercise in and opportunities for original artistic creation do not exist to check the tendency to become stale. It is perfectly evident that, while a limited number of performances during a year may be a stimulus to his musical progress, such work should not be allowed to interfere with his general education and his thorough musical culture.

I have made these rather lengthy observations on this point because the tendency toward exploitation, which might exist under his present custodianship, would prevail in a quite lesser degree if the child were in the custody of his parents. In justice to Miss Lackey, it must be said that the parents themselves originally urged public concerts because they were in need of money. The situation, however, has changed. They now seem to be assured of financial independence at the hands of their patrons, and the temptation to exploitation will thus be entirely removed. While Miss Lackey is also assured of adequate and very generous support in the development of the child, nevertheless the temptation to material gain by the concert performances of Roger, who is now assured as much as $2,500 for a single performance, would be too great to be spurned. Of course it is only fair to say that she has rejected a number of offers, such as concert tours in foreign countries, but how long this self-restraint will continue, it is difficult to tell.

Experience derived from musical history would seem to indicate that a limitation of the number of public appearances or perhaps their total elimination for a time, might be of ultimate advantage to a child prodigy. No violinist is more admired to-day, both for virtuosity and real musicianship, than Fritz Kreisler. He also witnessed great triumphs as a child prodigy. But after a short time those in charge of him discontinued his public appearances and devoted all his time to a sound general and musical education, including university training. Commenting upon this, the writer in Grove (Vol. II, p. 599) observes: " Considering the position which youth holds, at the present day in the world of music, it is of the utmost significance to note that this step proved ultimately favorable to his development as an artist." A supervision, therefore, under which the motive of deriving profit from the concert work of the child will be entirely subordinated to the ultimate development of the child's spiritual and artistic growth, should

receive preference over any other. Where such supervision also involves custody by the parents, there is no room for doubt.

I am not unmindful of the splendid work of Miss Lackey. But even if the facilities which the parents now have to offer were somewhat less advantageous, I should have to respond to their demands. If there were any evidence that they had neglected their children, or adopted a previous attitude of indifference, I should be inclined to take a different view. But their very relinquishment of custody at the outset was prompted not by indifference but by solicitude for the best interests of the children. Even though the children have become much attached to Miss Lackey and she has certain claims to recognition, and even though the court might recognize her guardianship here, I must yield to the superior claims of the parents. This is the view which has been expressed in *Matter of Knowack (supra)* where the Court of Appeals, commenting upon the disposition in *Wilcox* v. *Wilcox* (14 N. Y. 575), said: " It thus appears that the eldest daughter had been placed in the custody of the grandfather voluntarily and had remained there for years; and yet, when circumstances had changed, and the mother became possessed of enough means the court intervened and restored the child to the custody of the mother, notwithstanding the relations that had grown up in the grandfather's family between the child and other relatives there residing and without regard to the letters of guardianship that had been duly issued to the grandfather."

I am, therefore, inclined to regard the right of the parents to permanent custody of the children as superior to those of the respondents. But I do not consider it in the best interests of the infants to turn them over immediately to the parents. Such disposition would be cruel to the children who are much attached to their present environment, and unfair to Miss Lackey. Besides, the continuity of their education and training should not be ruthlessly cut off without some gradual preparation for the new environment. Another consideration, although secondary, is that Miss Lackey in good faith has made arrangements and commitments for the balance of the year. While a change of custody would not necessarily interfere with the appearance of Roger in some or all of the scheduled public concerts, it might, by reason of the immediate temperamental effect upon the child and the breach in the continuity of preparation, be an obstacle to their complete artistic success. The plans for the balance of the year should, therefore, be carried out without interruption.

Although the credit for having discovered and developed the child's genius cannot be taken away from Miss Lackey, she is entitled to the additional prestige which may come to her by reason

of the wider public acclaim which may come from his prospective artistic success during the rest of the year. If incidentally she may thereby have an additional claim to material reward, this fact should not militate against her, as she is fully entitled to it. But if, in the interval, the tax of such a program may prove too great a strain upon the child, I shall entertain applications for its modification both from those immediately interested and from the New York Society for the Prevention of Cruelty to Children, whose representative, Mr. Vincent T. Pisarra, has furnished me valuable assistance, both in past instances and in the present case, and in whose judgment I have great confidence.

My views are, therefore, that the children should be returned to the custody of their parents after the first of the year, and that meanwhile they should continue under Miss Lackey's direction with such right of free visitation by the parents as will not interfere with their education, and with such proper provision for their training in the faith of their parents as I shall presently refer to.

But relator calls my attention to the limitation of the court's power upon a writ of habeas corpus, urging that the only thing that can be done here is either to deny the writ or to sustain it; and he cites in support of his contention *People ex rel. Sabatino* v. *Jennings* (246 N. Y. 258). In so far as he thinks that such a rule is applicable to cases involving the custody of children he is in error. In the *Sabatino* case the Appellate Division reversed the dismissal of the writ of the relator and his remand to prison, and directed that he be forthwith discharged from custody. From this disposition the People appealed, and pending the appeal attempted to hold him a prisoner. The Court of Appeals directed his immediate discharge, notwithstanding the pendency of the appeal, saying (at p. 260): " It would be intolerable that a custodian adjudged to be at fault, placed by the judgment of the court in the position of a wrongdoer, should automatically, by a mere notice of appeal, prolong the term of imprisonment, and frustrate the operation of the historic writ of liberty. 'The great purpose of the writ of habeas corpus is the immediate delivery of the party deprived of personal liberty (SHAW, C. J., in *Wyeth* v. *Richardson*, 10 Gray, 240).' * * * Little would be left of ' this, the greatest of all writs ' (*People ex rel. Tweed* v. *Liscomb*, 60 N. Y. 559, 566) if a jailer were permitted to retain the body of his prisoner during all the weary processes of an appeal begun without leave and languidly continued."

The common-law writ of habeas corpus was a writ in behalf of liberty, and its purpose was to deliver a prisoner from unjust imprisonment and illegal and improper restraint. It was not a

proceeding calculated to try the rights of parents and guardians to the custody of infant children. (*People ex rel. Pruyne* v. *Walts,* 122 N. Y. 238.) True, it was extended, because of its summary character, to determine the custody of a child, but a change of custody as decreed was not considered tantamount to a release from imprisonment; for frequently the wishes of the child itself, when it was of tender years, were disregarded, the court itself deciding the question with a view to the ultimate welfare of the child and the interests of society. If a change of custody were tantamount to a discharge from imprisonment, it would be difficult to sustain a frequent disposition, whereby the court apportions the custody among the contending parties. That the rule in the *Sabatino* case is limited to prisoners is shown by the opinion in that very case, in which Chief Judge CARDOZO observes (p. 261): " There is no occasion to determine at this time whether different considerations apply to proceedings under section 93 of the Insanity Law, where the question to be determined is whether one lawfully committed to an asylum has thereafter become sane. It is certain that other considerations affect proceedings in habeas corpus to determine the custody of infants, where custody is dependent upon equitable principles (*People ex rel. Young* v. *Stout,* 31 N. Y. Supp. 421; *People ex rel. Lawrence* v. *Brady,* 56 N. Y. 182, 192)."

While I have no doubt of the power of the court to postpone the change of custody to a future time, I deem it advisable to defer final disposition of the case to the end of the year, meanwhile leaving the children in the care of respondents. By that time the court will be in a better position to judge of the effect of the present program for the children upon their general welfare, and to determine to what extent Miss Lackey should have continued access to them, and in what respect, if at all, she should be permitted to participate in the supervision of their musical education.

In the meantime, however, it is imporant that the spiritual education of children of such an impressionable age should be properly safeguarded. It is conceded that the wishes of their parents to have them brought up in the religion of their ancestors must be respected. And this is also the view which the law takes. It does so, not as a matter of sentiment or out of deference to narrow sectarian views, but as a matter of sound public policy. The family is the institutional unit in which infants, in co-operation between the home, the school and the church or other spiritual agency, can best be prepared as members of society and as good citizens. Even though the infant be physically separate from the family, it is still constructively a part of it, and entitled to be brought up in the religious faith professed by its parents. These principles

are entirely consistent with the American view of religious liberty. As is said in *Matter of Jacquet* (40 Misc. 575, 577): " Liberty of conscience is a fundamental right of American citizenship. Most of us believe with Jefferson that religion is a matter which lies solely between man and his God, and that he owes accountability to none other for his faith and worship.

" It is said in *Watson* v. *Jones*, 13 Wall. [U. S.] 679, 728, that: ' In this country the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all. The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect.'

" *But these principles and rights appertain in full only to those who have reached majority or mature judgment. During the period of immaturity incident to infancy the father and mother are the natural guardians of their children. They must shield them from dangers and temptations that beset not only their physical and moral, but also their spiritual, welfare. It is for them to lead in the path of a religion of their own choosing.*" (Italics mine.)

The surrogate, therefore, concluded that " principle and authority impel this court to commit these children to Catholic guardianship until maturity shall give to each that absolute freedom of choice of a religious belief that his judgment and conscience approves, which is the birthright of his American citizenship."

And in *Matter of Lamb* (139 N. Y. Supp. 685) one of our own distinguished surrogates, ROBERT LUDLOW FOWLER, himself a non-Catholic, thus expressed himself upon the desire of a father to have his child brought up in the Catholic faith, although he had forfeited the right to its custody in favor of the child's aunt, who was a Baptist: " The mother of the infant and her sisters, the infant's aunts, are in religion orthodox Baptists, while the father was born a Catholic, and is, no doubt, now seriously anxious that his only child should be of the faith of his fathers. Yet the father himself consented to be married by a Baptist minister, and was so married. This was not a Catholic observance on his part. It also appears that at some moment, unknown to the maternal aunts, the father had the child baptized in the church of his own youthful faith and upbringing, and thus the child is in name and faith made a Catholic. To me this does not seem so unnatural as it does to the aunts. The mere impulses of a person who, like the father, belongs by submission, at least, to a great, historic, and disciplined faith, coming down all the ages of our era, are not now the impulses of those of us who are outside of that church. I am bound to conclude that

the father is most sincere in his contention that the whole future wellbeing of his child depends solely on its conformity with the Catholic faith. Certainly this is a natural conviction in his case, as his own mother, his family and all the traditions of his life and race are Catholic. We, none of us, even if not religiously inclined, can cast aside such sacred associations. That the father was sincere in his action in having his child baptized in the Catholic communion is, I think, shown by the fact that at the time he had the child baptized a Catholic it had no prospect of an estate. But if it were otherwise, and if the father simply states to me, as he does, that he has religious scruples, I am bound to assume that he states truly and to give them respect. He is the father, with all the rights the law confers on a father. The court cannot traverse a statement of this kind by a father. There are some statements which admit of no denial in a court of justice, and the father's statement of his religious convictions is one. If a father of any faith, Jew or Gentile, Protestant or Catholic, states in this court that he has religious scruples, there can be no traverse of that statement here. This is a land where all forms of religion are both free and protected, and where the rights of fathers, within the law, are still recognized and enforced in proper cases.

" The question before the surrogate is not what form of religion would be most advantageous for the child, but what are the rights of the parties to care for her estate and temporal custody. The surrogate is the servant of the law, and he can have no right to obtrude his individual opinion on matters of faith on the parties who resort to this court for assistance in cases they are pleased to submit to the surrogate."

And he thus determined the right of the father to dictate the religious bringing up of his child: " The father even yet, in contemplation of our common law, is priest and king in his own household. 1 Bla. Com. 453. Even if he is an unworthy father, he is not *ipso facto* dethroned, and he retains a right to regulate the religious welfare of his own infant. *Matter of Crickard*, 52 Misc. Rep. 66. I am, I think, obliged by law to defer to the expression of the father's wish for the religious training of his infant child."

As the same learned surrogate further pointed out in *Matter of Mancini* (89 Misc. 83) in placing a child under Protestant guardianship on condition that it be brought up in the Catholic faith, the religion of its deceased parents: " In matters of education, and equally so with Jews and Gentiles, Protestant and Catholic, the wishes of the infant's family are to be respected by the court. Each particular faith has more or less deep-seated notions and tenets about education which go to the whole future life and con-

duct of the child. To Catholics, in particular, the education of an infant, leading as it does to their indissoluble marriage law, and their family relations founded on a subordination and respect to elders, the education, I say, of their infants in their own way is regarded by them as of paramount importance. It is evident that the preference of a Catholic family in regard to the education of a Catholic child cannot be overlooked by the court in the selection of a guardian for a Catholic child."

The respondents are not Catholics, and I deem it wise, therefore, that in the interim, Rev. John J. Hartigan of No. 207 West Ninety-sixth street, New York, supervise and direct the religious training of the children in the Roman Catholic faith. In thus designating Father Hartigan, I follow the precedent set by Surrogate FOWLER in *Matter of Lamb* (*supra*), and I make the same provision as in that case that in the event of any disagreement between him and Miss Lackey, either party may apply to me on notice to the other for such disposition as may be just in the premises.

The application will stand adjourned until December 15, 1930, at two P. M. in Trial Term, Part III, for final disposition upon the hearing of such supplementary testimony with regard to matters arising in the interim, as the parties may be advised to offer.*

---

* Order entered December 30, 1930, sustaining writ of habeas corpus upon the merits in favor of the relator.— [REP.